**Thurman DURANT, Petitioner,**

v.

**Wayne STRACK, Superintendent, Fishkill Correctional Facility, Respondent.**

No. 98–CV–7993 (FB).

United States District Court, E.D. New York.

June 19, 2001.

Erica Horwitz, Appellate Advocates, New York City, for Petitioner.

Richard A. Brown, District Attorney, Queens County by Emil Bricker, Assistant District Attorney, Kew Gardens, NY, for Respondent.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Petitioner Thurman Durant ("Durant") filed this petition pursuant to 28 U.S.C. § 2254 challenging his January 1996 judgment of conviction in New York Supreme Court, Queens County, for criminal possession of a controlled substance in the third degree and in the seventh degree. The petition asserts that the trial court (1) permitted the prosecutor to violate *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and (2) violated Durant's Sixth Amendment right to a public trial. On May 19, 2000, the Court referred the petition to Magistrate Judge Roanne L. Mann ("Judge Mann"). Judge Mann submitted a Report and Recommendation ("R & R") on April 3, 2001 recommending that the petition be granted on the first ground only. The Court is in receipt of Durant's objections to Judge Mann's recommendation concerning the second ground for the petition. Respondent has not filed any objection to the R & R.[1]

 "If either party objects to the magistrate judge's recommendations, a judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *United States v. Tortora*, 30 F.3d 334, 337 (2d Cir.1994) (internal quotations omitted). "[A] party generally waives judicial review of an issue when he or she fails to make timely objection to a magistrate judge's

report, as long as all parties receive clear notice of the consequences of their failure to object." *DeLeon v. Strack*, 234 F.3d 84, 86 (2d Cir.2000) (citing *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989) (per curiam)). "This rule, however, is a nonjurisdictional waiver provision, and its violation may be excused in the interests of justice." *Id.* (citing *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)). Further, the Court will excuse the failure to object and conduct a *de novo* review if it appears after reading the R & R that the magistrate judge may have committed plain error in ruling against the defaulting party. *See Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 174 (2d Cir.2000).

The Court has reviewed the R & R *de novo* in respect to Durant's objections, and concurs with Judge Mann. It is sufficiently apparent in the record that the decision of the trial judge to close the courtroom during the testimony of the two undercover police officers took into consideration the alternative suggested by trial counsel for Durant. *See Bowden v. Keane*, 237 F.3d 125, 132 (2d Cir.2001). Competent evidence existed to justify this limited closure. *See id.* (quoting *United States v. Farmer*, 32 F.3d 369, 371 (8th Cir.1994)) ("specific findings by the [trial] court are not necessary if we can glean sufficient support for a partial temporary closing from the record"). Because respondent has not filed objections, the Court has not conducted a *de novo* review in respect to the *Batson* issue; however, the Court has read the R & R and finding no plain error adopts the recommendation to grant the writ.

## CONCLUSION

Accordingly, the Court adopts the R & R in its entirety. Respondent is directed

---

1. The Court confirmed that respondent does not intend to file objections in a telephone call with A.D.A. Emil Bricker on June 13, 2001.

either to release petitioner from custody or to retry him within 90 days of this order. *See, e.g., Noble v. Kelly,* 89 F.Supp.2d 443, 464 (S.D.N.Y.2000) (granting writ and ordering release or retrial within 90 days), *aff'd,* 246 F.3d 93 (2d Cir.2001).

**SO ORDERED.**

### *REPORT AND RECOMMENDATION*

MANN, United States Magistrate Judge.

In this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, petitioner Thurman Durant ("petitioner" or "Durant") seeks relief from a state drug conviction. Durant claims that (1) the prosecution excluded a prospective juror on the basis of her race, in violation of the Equal Protection Clause of the Fourteenth Amendment; and (2) the trial court closed the courtroom, in violation of the Public Trial Clause of the Sixth Amendment.

The Honorable Frederic Block referred the petition to the undersigned for a report and recommendation. For the reasons that follow, this Court recommends that the petition be granted on the first ground only.

### *FACTUAL BACKGROUND*

**The Evidence at Trial and Durant's Conviction**

Late in the evening of January 28, 1995, Durant was arrested in a Queens County "buy-and-bust" operation. An undercover police officer ("UC 26210") approached a man, later identified as Jerome Robinson, and told Robinson that he was looking for three five-dollar packages of crack cocaine. Trial Transcript ("Tr.") at 366–68. Robinson told him to wait at that location and he would get him something. *Id.* at 369. Shortly thereafter, a "back-up" or "ghost" undercover officer ("UC 12328") observed

Robinson entering a Chinese restaurant and handing money to Durant in exchange for a clear plastic bag containing something orange. *Id.* at 430–35. When Robinson returned to UC 26210, he sold the officer three vials of crack with orange caps, in exchange for $15 in pre-recorded bills. *Id.* at 373–74. Detective Kathleen Kragel then arrested Robinson and recovered the pre-recorded buy money from his person. *Id.* at 502–05. Detective Joseph Savine arrested Durant and found in his possession 57 filled vials with orange caps, as well as a baggie containing 59 filled vials with green caps. *Id.* at 473–77. Subsequent laboratory analyses of the vials revealed that the three vials Robinson sold UC 26210 contained cocaine, as did the 116 vials seized from Durant. *Id.* at 564–70, 589–92.

A Queens County grand jury charged Durant with criminal sale of a controlled substance in the third degree (N.Y. Penal Law § 220.39) and criminal possession of a controlled substance in the third and seventh degrees (N.Y. Penal Law §§ 220.16[1] and 220.03). Following a jury trial in late 1995, Durant was found guilty of possessing the 116 vials of crack cocaine, but not guilty of the sale of the three vials to the undercover officer. Tr. at 704–05. On January 5, 1996, Durant was sentenced to a prison term of nine to eighteen years.

**Courtroom Closure**

After opening statements to the jury, the trial court held an evidentiary hearing on the prosecution's motion to close the courtroom during the testimony of the two undercover police officers, UC 26210 and his back-up, UC 12328. Both men testified that they were still actively working as undercover officers in the vicinity of Durant's arrest. Tr. at 292, 305, 324–25. In addition, they both had several cases pending in the Kew Gardens courthouse in which Durant's case was pending. *Id.* at

293, 320–21. In fact, UC 26210 stated that he had seen some of the subjects of those cases around the courthouse as recently as two weeks earlier. *Id.* at 294, 303. Both officers testified that in the past they had been threatened by people who believed that they were police officers. *Id.* at 309, 323, 328. For the above reasons, the officers feared for their safety if the courtroom remained open, because their involvement in law enforcement would be revealed. *Id.* at 294–95, 323–24.

Following the above testimony, and in the course of argument by counsel, Durant's attorney asked that he be heard on alternatives to closure of the courtroom. *Id.* at 329. Defense counsel proposed that a court officer be stationed outside the courtroom to prevent entry by anyone with a pending drug case in the upstairs trial part that heard solely drug cases. *Id.* at 330. In response, the prosecutor argued that defense counsel's alternative was "entirely unrealistic" because the court officer would have to question those attempting to enter the courtroom and rely on the truthfulness of their answers. *Id.* at 332. Having considered the testimony and the arguments of counsel, the judge thereupon granted the motion to close the courtroom during the testimony of the two undercover officers, concluding that the prosecution had established compelling reasons to justify such partial closure. *Id.* at 334.[1] The judge did not expressly address defense counsel's proposed alternative or the prosecution's challenge to the adequacy of that proposal. *See id.*

**Jury Selection**

During jury selection, at the end of the second round of voir dire, the prosecutor exercised three peremptory challenges against three jurors, two of whom were

black. *Id.* at 195, 197. In response, defense counsel made a motion pursuant to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), noting that the prosecutor had challenged two of the three blacks on the panel, Prospective Juror Number 3, Rudy Porter, and Prospective Juror Number 4, Shaliya Brooks.[2] Tr. at 197–98. After hearing argument on whether the defense had made a prima facie showing of intentional discrimination, and over the prosecutor's continued objection that no such showing had been made, the judge directed the prosecutor to provide race-neutral reasons for striking the two jurors. *Id.* at 199. Turning first to Mr. Porter, the prosecutor claimed that she had challenged him "due to his job in [New York City's Department of] Human Resources and the fact that he deals with Human Resources cases ...." *Id.* With respect to Ms. Brooks, the prosecutor explained that she was challenging her because of "her demeanor with me, the way she was looking at me, the interaction I had with her." *Id.* at 200. When the judge pressed the prosecutor to be more specific in explaining her challenge to Ms. Brooks, the following colloquy ensued:

[THE PROSECUTOR]: She was making faces at me while I was questioning her.

THE COURT: Making faces?

[THE PROSECUTOR]: Yes, Judge. And her questions—I find that the tone of her responses were [sic] very hostile. Based on that.

THE COURT: We must not have been listening and watching the same person because I didn't see any faces or hear any hostile answers.

1. The transcript of their testimony was not placed under seal.

2. Durant's habeas petition challenges only the strike of Ms. Brooks.

[THE PROSECUTOR]: Well, Judge, I was the one that was questioning her, standing right before me.

THE COURT: Well, I'm looking right at her, also.

[THE PROSECUTOR]: Well, Judge, that's my answer.

THE COURT: Okay. As to juror number 3 [Mr. Porter,] I accept your reason and that will stand. If that's your reason for number 4 [Ms. Brooks], it's denied and the juror will not be challenged.

*Id.* Thus, the trial judge sustained the prosecutor's challenge as to juror number 3 and rejected the prosecutor's challenge as to juror number 4.

Seeking to reargue the issue, the prosecutor again objected that no prima facie case had been established, and that she should not have been required to explain her strike. *Id.* at 200–01. The judge solicited further argument from both counsel on the issue of a prima facie showing. *Id.* at 201–05. After a brief recess, the judge declared that the defense had "not come close to establishing a prima facie case" and, "[a]ccordingly, the People are not required to give a race neutral reason for their challenges." *Id.* at 206. Citing *People v. Childress,* 81 N.Y.2d 263, 598 N.Y.S.2d 146, 614 N.E.2d 709 (1993), and *People v. Jenkins,* 84 N.Y.2d 1001, 622 N.Y.S.2d 509, 646 N.E.2d 811 (1994), the judge now denied defense counsel's *Batson* challenge to Ms. Brooks and refused to seat her as a juror. Tr. at 206.

**Durant's Direct Appeal**

Durant appealed his conviction to the Second Department, challenging, on constitutional grounds, the trial court's sustaining of the prosecutor's strike of Ms. Brooks after having found it to have been

improperly motivated. Brief for Defendant–Appellant [on Direct Appeal] at 16–23.[3] In response, the State argued, *inter alia,* that the trial judge never ruled on the ultimate question of discrimination, as he found instead that Durant had failed to establish a prima facie case. Brief for Respondent [on Direct Appeal] (Pet.Ex. D) at 20–21. As to the courtroom closure issue, Durant contended that he had been deprived of his right to a public trial because the judge closed the courtroom rather than adopting a less restrictive alternative. Pet. Ex. C at 24–29. The State countered that the trial judge correctly rejected Durant's proposed alternative as insufficient to ensure the safety of the undercover officers. Pet. Ex. D at 26–33.

In a four-to-one decision, the Second Department affirmed Durant's conviction. *People v. Durant,* 250 A.D.2d 698, 672 N.Y.S.2d 433 (2d Dep't), *appeal denied,* 92 N.Y.2d 879, 678 N.Y.S.2d 26, 700 N.E.2d 564 (1998). In rejecting Durant's *Batson* claim, the Second Department described the proceedings before the trial court:

Although the prosecutor objected that the defense counsel failed to make a prima facie showing that she had exercised her challenges in a racially-discriminatory manner, the trial court required the prosecutor to provide race-neutral reasons for her challenges, and made a preliminary determination to disallow one of the strikes. However, the prosecutor continued to maintain that no prima facie case had been established, and after reviewing relevant authority during a recess, the trial court agreed, and permitted the prosecutor's challenge to stand.... [T]he trial court never made a final ruling on the issue of whether the defendant had sustained his

---

**3.** Durant's appellate brief in the Second Department is appended as Exhibit ("Ex.") C to

his Petition for a Writ of Habeas Corpus ("Pet.").

ultimate burden of proving intentional discrimination under the third prong of the *Batson* test.

250 A.D.2d at 698–99, 672 N.Y.S.2d at 434. According to the majority opinion, "[t]he fact that the trial court erroneously made a preliminary ruling that a prima facie case had been established, and ruled on the issue of whether the challenges to two potential jurors had been proper, did not render moot the issue of whether the defendant carried his initial burden of proof." *Id.* at 699, 672 N.Y.S.2d at 434. In other words, "the court's preliminary, third-step finding that the prosecutor had used one of her strikes improperly did not prohibit it from reconsidering its ruling upon a determination that no facts and circumstances sufficient to raise an inference of discrimination had been shown." *Id.* at 699, 672 N.Y.S.2d at 434–35. The Appellate Division concluded that, "as clearly no third-step determination was required, none was in fact ever rendered." *Id.* at 699, 672 N.Y.S.2d at 435. The majority therefore rejected Durant's *Batson* claim.

Regarding the public trial issue, the Appellate Division unanimously held that "the trial court did not improvidently exercise its discretion in rejecting [Durant's] proposed alternative to closure." 250 A.D.2d at 700, 672 N.Y.S.2d at 435. Although it recognized that the trial court did not "explicitly state its reasons for rejecting [Durant's] proposal," the Appellate Division inferred "from the trial court's findings that it accepted the People's argument that the proposed alternative would not fully protect the officers' safety." *Id.* at 700, 672 N.Y.S.2d at 435.

One justice on the appellate panel vigorously dissented on the jury selection issue. According to the dissent, the State's challenge to the black juror should not have been upheld given the trial court's finding that the prosecutor's explanation for the challenge was pretextual. *Id.* at 700, 672 N.Y.S.2d at 435 (Ritter, J., dissenting). Once the trial court ruled on the ultimate question of discrimination, the issue of whether Durant had made a prima facie showing was moot and should not have been the basis for denying his *Batson* motion. 250 A.D.2d at 701, 672 N.Y.S.2d at 436. The dissent rejected the majority's characterization of "various of the trial court's rulings as merely 'preliminary,'" as well as the majority's finding that "no step-three determination was actually made (or was also merely a 'preliminary finding')." *Id.* at 701, 672 N.Y.S.2d at 436 (Ritter, J., dissenting).

On July 24, 1998, Durant's application for leave to appeal to the Court of Appeals was denied. *People v. Durant*, 92 N.Y.2d 879, 678 N.Y.S.2d 26, 700 N.E.2d 564 (1998).

## *DISCUSSION*

### Habeas Review of State Court Decisions

Durant's petition is governed by the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"), which amended the federal habeas statute, 28 U.S.C. § 2254 (1994 & Supp.1998), and thereby limited the power of federal courts to grant writs of habeas corpus to state prisoners. Section 2254(d) prohibits the grant of a writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless one of several requirements has been satisfied. The first ground for issuance of a writ is that the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Alternatively, a federal court may grant a writ if the state adjudication "resulted in a decision that was based on an unreason-

able determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).

■■■ The "contrary to" and "unreasonable application" clauses of section 2254(d)(1) have "independent meaning." *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J.). The Supreme Court has explained the "contrary to" provision as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases.... A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent....

*Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495. Alternatively, under the second prong of section 2254(d)(1), a decision of a state court can be set aside as an "unreasonable application" of federal law "if the

state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407, 120 S.Ct. 1495.[4]

In addressing the degree of deference owed to state court decisions, the Supreme Court has stated that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively reasonable." *Williams*, 529 U.S. at 409, 120 S.Ct. 1495. The appropriate question is not whether the state court's decision was incorrect or erroneous, but whether it was unreasonable. *Id.* at 410, 120 S.Ct. 1495. Nevertheless, as the Second Circuit has repeatedly cautioned, while "[s]ome increment of incorrectness beyond error is required[,] ... [that] increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks and citation omitted); *accord Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000).[5]

---

4. A plurality of the Supreme Court has also concluded that a state court decision can be set aside under the "unreasonable application" provision of section 2254(d)(1) where "the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000) (plurality opinion). However, no majority decision of the Supreme Court, nor any opinion by the Second Circuit, has decided whether an unreasonable refusal to extend Supreme Court precedent is sufficient to satisfy AEDPA's "unreasonable application" provision. *See Lurie v. Wittner*, 228 F.3d 113, 129–30 (2d Cir.2000) (citing *Williams*, 529 U.S. at 408–09, 120 S.Ct. 1495), *cert. denied*, ── U.S. ──, 121 S.Ct. 1404, 149

L.Ed.2d 347, 2001 WL 118866 (U.S. March 26, 2001). This Court's recommendations on the two issues raised by Durant would remain the same under either construction of section 2254(d)(1).

5. In canvassing the case law construing the "unreasonable application" phrase of section 2254(d)(1), the Second Circuit has lamented that "the meaning of the phrase in practice remains uncertain." *Francis S.*, 221 F.3d at 110. This state of affairs prompted one jurist to comment: "Perhaps, as Justice Stewart said in another context, the best one can say is that the court knows it when it sees it." *Collins v. Travis*, 00 Civ. 3746(AJP), 2000 WL 1476664, at *6 (S.D.N.Y. Oct. 5, 2000) (citing *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct.

For the reasons that follow, this Court concludes that the trial court's ruling and Second Department's decision both were contrary to and involved unreasonable applications of clearly established Supreme Court precedent with respect to the *Batson* issue, and that the state appellate opinion also was based on an unreasonable determination of the facts; the Court further concludes that the decision to order partial closure of the courtroom was based on a reasonable determination of the facts and was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

## Petitioner's *Batson* Claim

In *Batson,* the Supreme Court held that the Equal Protection Clause prohibits the state from challenging potential jurors based on their race. 476 U.S. at 89, 106 S.Ct. 1712. The *Batson* Court recognized that "[e]xclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure." *Id.* at 85, 106 S.Ct. 1712. Moreover, "[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Id.* at 87, 106 S.Ct. 1712.

Borrowing from the clearly established *McDonnell Douglas* burden-shifting model in Title VII employment and other discrimination cases, the Supreme Court has outlined a three-step process for evaluating whether a jury selection procedure involves purposeful racial or other invidious discrimination. *See Batson,* 476 U.S. at 93–94 & n. 18, 106 S.Ct. 1712 (citing, *inter alia, U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981);

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)). First, the party opposing the peremptory challenge must make a prima facie showing that the challenge was exercised on the basis of a prohibited factor such as race. *See Hernandez v. New York,* 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *accord Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712; *Jordan v. Lefevre,* 206 F.3d 196, 200 (2d Cir.2000). Second, if the requisite showing has been made, the burden of production then shifts to the proponent of the strike to articulate a race-neutral explanation for challenging the prospective juror. *See Hernandez,* 500 U.S. at 358–59, 111 S.Ct. 1859; *accord Purkett,* 514 U.S. at 767, 115 S.Ct. 1769; *Batson,* 476 U.S. at 97–98, 106 S.Ct. 1712; *Jordan,* 206 F.3d at 200. Finally, the trial court must decide whether the party opposing the strike has carried his burden of proving purposeful discrimination. *See Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859; *accord Purkett,* 514 U.S. at 767, 115 S.Ct. 1769; *Batson,* 476 U.S. at 98, 106 S.Ct. 1712; *Jordan,* 206 F.3d at 200.

■ The third and final step of the *Batson* analysis focuses on the persuasiveness of the attorney's race-neutral explanation for the challenge, *see Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859, which " 'largely will turn on evaluation of credibility,' " including the demeanor of the attorney exercising the peremptory challenge. *Id.* (quoting *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712); *see Barnes v. Anderson,* 202 F.3d 150, 157 (2d Cir.1999) ("The credibility of an attorney offering a race-neutral explanation is at the very heart of [the step-three] analysis."). Because the trial judge

1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring)).

is uniquely situated to assess the striking attorney's state of mind based on credibility and demeanor, *see Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859, "a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712; *accord Hernandez*, 500 U.S. at 364, 111 S.Ct. 1859.

 In his petition, Durant argues that once the trial judge required the prosecutor to articulate a facially non-discriminatory reason for challenging Ms. Brooks, and then rejected the proffered explanation, the issue of whether the defense had made a prima facie showing of discrimination became moot. In other words, Durant contends, the trial judge should not have reverted back to the first prong of the *Batson* test after the prosecutor tendered her reasons for the challenge and the judge clearly disbelieved them. According to Durant, in nevertheless sustaining the prosecution's challenge to Ms. Brooks, the trial judge deprived Durant of his equal protection rights, in violation of *Batson* and its progeny.

Specifically, Durant relies on the Supreme Court's decision in *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395. In *Hernandez*, the defense counsel objected that the prosecutor had improperly exercised four peremptory challenges to exclude Latino prospective jurors. Without awaiting a ruling from the trial judge as to whether the defense had established a prima facie case, the prosecutor offered an explanation for his challenges. The trial judge accepted the explanation and allowed the challenges to stand. In a plurality opinion, the Supreme Court declined to review whether the defense had made a prima facie showing, concluding that the question was no longer relevant. 500 U.S. at 359, 111 S.Ct. 1859. The Court declared: "Once a prosecutor has offered a race-neutral explanation for

the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Id.*

In so concluding, the Court in *Hernandez* cited *Aikens*, again invoking clearly established case law from the Title VII employment discrimination context. In *Aikens*, the district court had ruled, during trial, that the plaintiff had made out a prima facie case of discrimination. *See* 460 U.S. at 714 & n. 4, 103 S.Ct. 1478. Nevertheless, at the conclusion of the bench trial, the court dismissed the action, finding that the plaintiff had failed to establish a prima facie case. *See Aikens v. U.S. Postal Serv.*, 642 F.2d 514, 516 (D.C.Cir.1980), *judgment vacated*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). On review, the Supreme Court concluded in *Aikens* that the trial court had erred in focusing on the prima facie showing rather than resolving the question of intentional discrimination based on the state of the record as it then existed. 460 U.S. at 715–17, 103 S.Ct. 1478. The Supreme Court held that "when the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the fact finder must then decide whether the rejection was discriminatory within the meaning of Title VII." 460 U.S. at 714–15, 103 S.Ct. 1478 (footnote omitted). To instead focus on the sufficiency of the prima facie showing "unnecessarily evade[s] the ultimate question of discrimination *vel non*." *Id.* at 714, 103 S.Ct. 1478; *accord Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir.1995) (applying *Aikens* analysis to *Batson* challenge). As the Supreme Court observed in *Aikens*: "Where the defendant has done everything that would be required of him if the plaintiff had properly

made out a prima facie case, whether the plaintiff really did so is no longer relevant." 460 U.S. at 715, 103 S.Ct. 1478. The Supreme Court therefore remanded the case to the trial court to determine whether the defendant had intentionally discriminated against the plaintiff. *Id.* at 717, 103 S.Ct. 1478.

 As the Supreme Court has acknowledged, the principle announced in *Aikens* applies with equal force in the *Batson* context. *See Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859 ("the same principle applies under *Batson.*"); *see also Batson,* 476 U.S. at 94 n. 18, 96 n. 19, 106 S.Ct. 1712 (importing *Aikens* and Title VII analysis into jury selection context). The primary purpose of the *Batson* doctrine is to prevent invidious discrimination in jury selection and in resulting jury verdicts, and thus the crux of the issue in *Batson* claims, as in Title VII cases, is whether a discriminatory motive exists. *See Batson,* 476 U.S. at 96, 106 S.Ct. 1712 (recognizing that "peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.") (internal quotation marks and citation omitted); *Jordan,* 206 F.3d at 202 ("*Batson* requires a trial judge to ensure that a defendant on trial is afforded the equal protection of the law."). The sole purpose of the burden-shifting procedure is to help the fact-finder answer the ultimate question of discrimination. *See Aikens,* 460 U.S. at 715, 103 S.Ct. 1478 (the prima facie case procedure "is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."); *accord Jones v. Plaster,* 57 F.3d at 422 (remanding for clarification of *Batson* findings). Hence, courts should not obscure the crucial factual issue of discrimination with a rigid application of the *McDonnell Douglas* or analogous framework. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (reaffirming *Aikens* ); *Aikens,* 460 U.S. at 715–16, 103 S.Ct. 1478 (the burden-shifting method was "never intended to be rigid, mechanized, or ritualistic.") (internal quotation marks and citation omitted); *Burdine,* 450 U.S. at 253, 255 n. 8, 101 S.Ct. 1089. Consequently, once a party opposing a *Batson* motion responds by explaining the reason for its peremptory challenge, the trial court must then determine whether the challenge was motivated by race or other improper factor. *See Purkett,* 514 U.S. at 767, 115 S.Ct. 1769 (per curiam) ("If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination."); *Jordan,* 206 F.3d at 200 (granting writ based on *Batson* violation where trial court failed to determine credibility of proffered explanations and ultimate issue of discrimination); *see also Aikens,* 460 U.S. at 714–15, 103 S.Ct. 1478; *Batson,* 476 U.S. at 98, 106 S.Ct. 1712. At this stage, the court "has before it all the evidence it needs to decide" whether prohibited discrimination has occurred. *See Aikens,* 460 U.S. at 715, 103 S.Ct. 1478; *Hicks,* 509 U.S. at 519, 113 S.Ct. 2742.

 Through its decisions in *Aikens* and *Hernandez,* the Supreme Court has clearly established the proposition that, in both the employment and jury selection contexts, courts may not ignore evidence of intentional discrimination by ruling instead on the sufficiency of the prima facie showing.[6] Once the burden-shifting proce-

---

6. Respondent does not dispute that the *Hernandez* principle constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). While respondent does note that *Aikens* was a statutory and not a constitu-

dure has advanced beyond the first step in the analysis and evidence suggestive of pretext has been laid before the court, the sufficiency of the initial showing becomes academic and "the trial and reviewing courts should look to the entire record to determine if intentional discrimination is present." *United States v. Clemmons*, 892 F.2d 1153, 1156 (3d Cir.1990). As here, "[i]f the prosecutor's explanation [for a peremptory challenge] raises more concern than it puts to rest, courts cannot effectively close their eyes to that fact by simply deciding that the defendant has not made out a prima facie case." *Id.* In other words,

> to allow the absence of a *prima facie* case to be case dispositive when the record raises serious questions about the prosecutor's motivations would defeat one of *Batson*'s principal purposes—to provide assurance to the defendant and the community that criminal judgments are not tainted by invidious discrimination. Where the record as a whole as ultimately developed permits a reasonable argument that the judgment is so tainted, the issue of taint must be resolved; it cannot be avoided by a finding that the defendant failed to present a *prima facie* case.

*Johnson v. Love*, 40 F.3d 658, 665 (3d Cir.1994) (affirming grant of writ on *Batson* grounds); *see Jordan*, 206 F.3d at 200 (Second Circuit again "emphasize[s] a trial court's duty at the third stage to determine the credibility of the proffered explanations," even in the absence of a prima facie showing).

Accordingly, as even the State was constrained to concede at oral argument before this Court,[7] whether or not Durant established a prima facie case, his conviction would have to be overturned if the prosecutor were found to have acted with a discriminatory purpose in exercising her peremptory challenge. *See United States v. Brooks*, 2 F.3d 838, 840–41 (8th Cir. 1993) ("Even if [the defendant] did not make a prima facie showing, his convictions must be overturned if the Government offered an explanation that is not race neutral or acted with discriminatory intent."); *United States v. Uwaezhoke*, 995 F.2d 388, 392 (3d Cir.1993).

That is precisely what happened here. After the trial judge discounted the sincerity of the prosecutor's stated race-neutral reason for her peremptory challenge to Ms. Brooks, and then sustained Durant's *Batson* application as to that juror, the trial court, at the prosecutor's urging, reverted back to the first step of the *Batson* analysis, thereby "evad[ing]" the ultimate question of discrimination *vel non*." *Aikens*, 460 U.S. at 714, 103 S.Ct. 1478.

The State advances two arguments as to why the trial court's turnabout was not contrary to Supreme Court precedent. Specifically, the State contends that *Batson*'s step-one inquiry concerning a prima facie showing is mooted out by the trial

---

tional decision, *see* Letter to the Court dated July 26, 2000, from Emil Bricker, Esq. ("Resp. 7/26/00 Ltr."), at 3, respondent concedes that the principle of *Aikens* on which the *Hernandez* Court relied has, "through *Hernandez*, [been] made applicable to constitutional law, and so to *habeas corpus* litigation." Resp. 7/26/00 Ltr. at 4. Moreover, the familiar three-step evidentiary framework that the Supreme Court imported into the *Batson* context "is derived from the Supreme Court's equal protection *and* Title VII jurisprudence." *Ev-*

*ans v. Smith*, 220 F.3d 306, 312 (4th Cir.2000) (emphasis added) (citing *Batson*, 476 U.S. at 93–98, 106 S.Ct. 1712).

7. *See* Transcript of Oral Argument on July 28, 2000, at 46 (respondent acknowledges that if the trial court allowed the prosecutor's challenge to stand after finding that it was motivated by race, "that would cut against the heart of what *Hernandez* says.").

court's finding of discrimination if and only if that finding (1) constitutes a "final ruling" *and* (2) is prompted by an explanation that was volunteered by the striking party and not extracted by the court. *See generally* Affidavit and Memorandum of Law in Opposition to Petition for a Writ of *Habeas Corpus* ("Resp.Mem.") at 22–38.

Notably, the State's distinction between volunteered and extracted explanations was not adopted by the trial court or Appellate Division nor advanced by the State at oral argument before this Court. Nothing in *Hernandez* suggests such a narrow reading; indeed, nearly every United States Court of Appeals has declined to adopt the distinction urged by the State,[8] as has the New York Court of Appeals.[9]

▉ The State offers no reasonable basis for its proffered distinction. If a liti-

gant provides an explanation that is not race-neutral or appears to be pretextual, it is of no moment that the explanation was extracted rather than volunteered. In either situation, the discriminatory motive violates the Constitution and cannot be ignored. Moreover, as a practical matter, it is sometimes unclear whether a trial judge's invitation to a party to respond to a *Batson* motion constitutes a demand for a non-discriminatory explanation for the strike, or an opportunity to challenge the opponent's prima facie showing. Where the proponent of the strike responds by offering a neutral reason for the strike, it may well be impossible to characterize the response as either extracted or volunteered. For this reason, there is no logical basis for limiting the scope of *Hernandez* as the State has proposed.[10]

**8.** *See, e.g., Caldwell v. Maloney,* 159 F.3d 639, 652 (1st Cir.1998); *United States v. Franklyn,* 157 F.3d 90, 97 (2d Cir.1998); *Uwaezhoke,* 995 F.2d at 392 (3rd Cir.1993); *Matthews v. Evatt,* 105 F.3d 907, 918 (4th Cir.1997); *United States v. Webster,* 162 F.3d 308, 349 & n. 55 (5th Cir.1998); *United States v. Hill,* 146 F.3d 337, 341 (6th Cir.1998); *United States v. Roberts,* 163 F.3d 998, 999 (7th Cir.1998); *Devoil–El v. Groose,* 160 F.3d 1184, 1186 (8th Cir.1998); *Stubbs v. Gomez,* 189 F.3d 1099, 1104–05 (9th Cir.1999), *cert. denied,* 531 U.S. 832, 121 S.Ct. 88, 148 L.Ed.2d 49 (2000); *United States v. Sneed,* 34 F.3d 1570, 1579, 1580 (10th Cir.1994); *United States v. Spriggs,* 102 F.3d 1245, 1255 (D.C.Cir.1997); *but see United States v. Stewart,* 65 F.3d 918, 924–25 (11th Cir.1995) (rejecting mootness claim where judge required prosecutor to explain peremptory strike). Contrary to the State's contention that "the Third and Seventh Circuits appear to draw such a distinction" (Resp. Mem. at 24), the decisions relied upon, *Johnson v. Love,* 40 F.3d 658, and *United States v. Cooper,* 19 F.3d 1154 (7th Cir.1994), do not distinguish between volunteered race-neutral justifications and those compelled by a court.

In this connection it bears noting that although AEDPA looks to Supreme Court precedent in its reference to "clearly established federal law," *see* 28 U.S.C. § 2254(d)(1), fed-

eral habeas courts are not precluded from considering the decisions of inferior federal courts, as "helpful amplifications of Supreme Court precedent," in "evaluating whether the state court's application of the law was reasonable." *Matteo v. Superintendent,* 171 F.3d 877, 890 (3d Cir.1999) (en banc) (citing *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir. 1998)), *cert. denied,* 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999).

**9.** *See People v. Payne,* 88 N.Y.2d 172, 181–82, 643 N.Y.S.2d 949, 955–56, 666 N.E.2d 542 (1996).

**10.** The State further submits that requiring litigants to explain their strikes absent a prima facie showing would circumvent *Batson's* step-one inquiry and force litigants to explain peremptory challenges "at judicial whim ...." Resp. Mem. at 26. However, where courts have held that a party's attempt to justify its peremptory challenge mooted the prima facie inquiry, those decisions continued to emphasize the importance of the first step of *Batson. See, e.g., Uwaezhoke,* 995 F.2d at 392; *Clemmons,* 892 F.2d at 1156 (urging trial courts to "expressly address the prima facie issue before requiring an explanation from the prosecutor," and underscoring that "we do not ... suggest that it is desirable for

The State additionally argues that the principles of *Hernandez* (and, by implication, *Aikens*) do not apply unless the trial court has definitively ruled on the ultimate question of intentional discrimination; according to the State, the trial judge here never expressly found that the prosecutor's strikes were racially motivated, *see* Resp. Mem. at 23–24, 27–31,[11] but merely uttered an "initial" or "preliminary comment" indicating his disagreement with the prosecutor's observations of Ms. Brooks' demeanor. *Id.* at 29. The State contends that the judge's only final *Batson* ruling was his conclusion that Durant's prima facie showing was insufficient to create an inference of discrimination. *Id.*

As an initial matter, the State's argument is factually flawed. Any reasonable reading of the voir dire transcript makes clear that the trial judge disbelieved the prosecutor's explanation for her peremptory challenge.[12] In addition, the trial judge's statement that the prosecutor's peremptory strike was "denied and the juror will not be challenged" (Tr. at 200) in no way intimates that he intended his ruling to be preliminary. In fact, the court ruled simultaneously on the challenges to jurors 3 and 4. Just as the judge's ruling allowing the challenge of juror number 3 was final, so too was his ruling with regard to juror number 4.[13] Only in the sense that he later reconsidered his ruling,[14] changed his mind, and decided to allow the challenge was his ruling as to juror number 4 in any way "preliminary."

In arguing that "the trial court here never made any preliminary ruling at all on the subject of pretext or racial animus," the State mistakenly relies on the Appellate Division's opinion. *See* Resp. Mem. at 27–28. While the State correctly notes that a factual finding by a state appellate court is "presumed to be correct," 28 U.S.C. § 2254(e)(1),[15] the State mischaracterizes the appeals court's finding. The Appellate Division found that the trial court "ruled on the issue of whether the challenges to two potential jurors had been proper," 250 A.D.2d at 700, 672 N.Y.S.2d at 434, and that the judge made a "preliminary, third-step finding that the prosecutor had used one of her strikes improperly ...." *Id.* at 699, 672 N.Y.S.2d at 434. Thus, the Appellate Division did

---

trial courts to turn immediately to the second step of the *Batson* test."). Such decisions are not, as the State supposes, invitations to judges to ignore the prima facie standard. Rather, reviewing courts have simply recognized that once a prosecutor explains her challenge, the court "should not become bogged down" in the prima facie inquiry and avoid the ultimate question of discrimination. *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.1987).

11. *But see id.* at 21 (referring to the trial court's "preliminary assessment that the prosecutor had discriminated in her challenge to one juror.").

12. Nothing in the record supports the State's speculative assumption that, in initially disallowing the prosecutor's challenge to Ms. Brooks, the court was simply expressing its own disagreement with the prosecutor's stated observations, as opposed to concluding that her explanation was pretextual. *See* Resp. Mem. at 29–30, 37.

13. Importantly, after disallowing the challenge to Ms. Brooks, the judge did not invite further argument from the parties on whether a prima facie case had been established. Had the prosecutor not attempted to resurrect that issue, Ms. Brooks surely would have been empaneled.

14. *See Durant*, 250 A.D.2d at 699, 672 N.Y.S.2d at 434–35 (noting that the trial court was not prohibited from "reconsidering" its step-three finding).

15. The determination of what the trial judge ruled is an issue of historical fact. *See Parker v. Dugger*, 498 U.S. 308, 320, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991).

find that the trial judge had ruled on the issue of pretext, albeit preliminarily. *See also id.* (noting that the "trial court never made a *final* ruling on the issue of whether the defendant had sustained his ultimate burden of proving intentional discrimination under the third prong of the *Batson* test.") (emphasis added).

To be sure, the Second Department's majority opinion also contains language to the effect that "as clearly no third step determination was required, none was in fact ever rendered." 250 A.D.2d at 699, 672 N.Y.S.2d at 435. To the extent that this represents a factual finding that the trial court never reached the issue of the propriety of the peremptory challenge, such a finding can only be characterized as an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), yet another basis under AEDPA for granting the writ. *See Durant,* 250 A.D.2d at 701, 672 N.Y.S.2d at 436 (Ritter, J., dissenting) (noting that the majority opinion's suggestion that the trial court had not made any step-three determination could not be supported by "a reasonable reading of the record ....").

■ To the extent that the Second Department was expressing a legal principle and not a factual finding in stating that "as clearly no third step determination was required, none was in fact ever rendered," *id.* at 699, 672 N.Y.S.2d at 435, the majority's conclusion has no support in case law or logic. Although the trial court was not legally obligated to demand a race-neutral explanation unless and until Durant made a prima facie showing, it does not follow that the trial court could not have ruled on the sincerity of the proffered explanation absent the requisite showing. *See Jordan,* 206 F.3d at 200 (noting that, consistent with *Hernandez,* "a trial judge may rule on a *Batson* application even in the absence of a prima facie showing of discrimination ...."); *Mahaffey v. Page,* 151 F.3d 671, 678 n. 7 (rejecting state's argument that "because it was not *required* under *Batson* to proffer race-neutral justifications until [the defense] established [its] prima facie case, it necessarily *could not* have furnished those justifications before a prima facie cases was established.") (emphasis in original), *vacated in part on reh'g,* 162 F.3d 481 (7th Cir.1998) (issuing writ unless state court granted new *Batson* hearing).[16] Like the trial court, the Appellate Division "attribute[d] far more significance to *Batson's* burden-shifting approach than it deserves." *Mahaffey,* 151 F.3d at 678 n. 7. Whether or not the

---

**16.** Nor does it follow that the trial court "could not have logically believed that intentional discrimination existed, yet ruled that no prima facie case of intentional discrimination had been made out." Resp. Mem. at 21; *see id.* at 28–29. The law is clear that any deficiencies in one party's case may be cured by proof presented by the opposing party. *See United States v. Calderon,* 348 U.S. 160, 164 & n. 1, 75 S.Ct. 186, 99 L.Ed. 202 (1954); *Bogk v. Gassert,* 149 U.S. 17, 23, 13 S.Ct. 738, 37 L.Ed. 631 (1893) (noting that "[i]t not infrequently happens that the defendant himself, by his own evidence, supplies the missing link" of evidence); *United States v. Ortiz–Rengifo,* 832 F.2d 722, 725 (2d Cir.1987) ("It is well established that a defendant's appellate challenge to the sufficiency of the evidence will be reviewed in light of the evidence as a whole, and even if it is the defendant who has supplied the only proof of an essential element of the charge against him, his sufficiency challenge will be rejected."); *United States v. Rosengarten,* 357 F.2d 263, 266 (2d Cir. 1966) (Friendly, J.) ("It is settled law that a defendant who offers evidence after the denial of a motion for acquittal at the close of the Government's case in chief waives any claim as to the sufficiency of that case considered alone," even where "the judge ignored the command of F.R.Crim.P.29(a) and reserved decision on such a motion ....") (citing *Calderon,* 348 U.S. at 164 n. 1, 75 S.Ct. 186).

trial court was required to make a third-step ruling, the only reasonable reading of the record reveals that it did so. Simply put, the Second Department's conclusion "lacks any foundation in precedent or in fact." *Id.* at 679 n. 7.

■ In any event, the Appellate Division's decision, and the State's argument, simply ignore the teachings of *Hernandez* and *Aikens* and thus are contrary to, and based on unreasonable applications of, clearly established federal law. Where, as here, a party's race-neutral explanation for its actions is rejected and results in a finding of purposeful discrimination, the court may not disregard that finding and revert back to stage one of the *Batson/Aikens* analysis. In this case, whether the trial court's initial rejection of the challenge to Ms. Brooks is characterized as "final" or "preliminary," the fact remains that the trial judge obviously disbelieved the prosecutor's purported justification for the strike, and that factual finding, based on credibility and demeanor, is "presumed to be correct." 28 U.S.C. § 2254(e)(1). Though the judge did not expressly state that the prosecutor had acted with discriminatory intent, that finding was implicit in his announcement that he would not sustain the peremptory challenge to Ms. Brooks: "The third-stage analysis ... compels courts to determine the credibility of the proffered explanations." *Barnes,* 202 F.3d at 156 (internal quotation marks and citation omitted).[17] Having made that determination, the trial judge should not then have focused on Durant's initial burden of proof, as that issue had dropped from the case. In allowing the peremptory challenge to stand, after having found it to be tainted by purposeful discrimination,

the trial court effectively endorsed that discrimination and unreasonably deviated from the Supreme Court's decisions in *Hernandez* and the Title VII precedents on which it was based.

For the foregoing reasons, this Court recommends that the writ be issued on this ground.

**Public Trial Claim**

■ Durant additionally claims that his Sixth Amendment right to a public trial was violated when the trial court ordered the courtroom closed during the testimony of the two undercover police officers. Durant contends that the trial court erred in failing to consider and implement a reasonable and less restrictive alternative that was proposed by defense counsel, to wit, having a court officer screen individuals as they entered the courtroom. In response, the State argues that not only did the trial court consider and reject the defense's proposed alternative, but the court implemented its own alternative to complete closure—closing the courtroom only during the testimony of the two officers and releasing the transcript of the officer's testimony.

■ The Sixth Amendment guarantees the right to a public trial for the accused in a criminal proceeding. *Waller v. Georgia,* 467 U.S. 39, 43–44, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *see also Duncan v. Louisiana,* 391 U.S. 145, 148 & n. 10, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (right to public trial applies to the states via the Fourteenth Amendment). This Sixth Amendment right co-exists with the First Amendment right of the press and the public, and the standard to justify courtroom closure is the same under either

---

**17.** As the Supreme Court observed in *Hernandez:* "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a per- emptory challenge should believed" and "the best evidence often will be the demeanor of the attorney who exercises the challenge." 500 U.S. at 365, 111 S.Ct. 1859.

constitutional theory. *Waller*, 467 U.S. at 46–47, 104 S.Ct. 2210. In *Waller*, the Supreme Court outlined a four-part test for courtroom closure:

(1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced;

(2) the closure must be no broader than necessary to protect that interest;

(3) the trial court must consider reasonable alternatives to closing the proceeding; and

(4) it must make findings adequate to support the closure.

*See id.* at 48, 104 S.Ct. 2210 (citing *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 511–12, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)); *Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir.2001).

Durant's challenge concerns the second, third and fourth prongs of the *Waller* test.[18] Durant contends that the trial court erred both in failing to consider and adopt the less restrictive alternative proposed by defense counsel and in neglecting its responsibility to "make findings adequate to support the closure." Memorandum of Law In Support of Petition for a Writ of Habeas Corpus at 43.

With respect to the second prong, this case bears no resemblance to the facts in *Waller*, where the trial court closed an entire seven-day suppression hearing in order to prevent publication of 2 ½ hours of wiretap evidence. Here, in contrast, the courtroom closure was partial: the trial court closed the courtroom during the testimony of only two witnesses, and the transcript of their testimony was publically available. *See Campbell v. Sabourin*, 37

F.Supp.2d 601, 604 (E.D.N.Y.1999) (presence of jury and public availability of transcript attenuates "the specter of the 'secret trial'" that motivated ratification of the Public Trial Clause). Thus, the closure here was no broader than necessary to protect the state's interest in the safety of the undercover officers. *See Jones v. Stinson*, 94 F.Supp.2d 370, 395 (E.D.N.Y.) (holding that closure was narrowly tailored where courtroom was closed only during testimony of two undercover officers and transcript was not sealed), *rev'd on other grounds*, 229 F.3d 112 (2d Cir.2000).

■ Regarding the third prong (concerning the efficacy of lesser alternatives), the trial court had already considered and adopted an alternative to complete courtroom closure—limited closure, during the testimony of the undercover officers only. *See Ayala v. Speckard*, 131 F.3d 62, 71–72 (2d Cir.1997) (en banc) (characterizing partial closure as alternative to complete closure); *Jones v. Stinson*, 94 F.Supp.2d at 395 ("[T]he trial court considered, and ordered, a reasonable alternative to closure, namely, limited closure during the testimony of the two officers."). Moreover, moments before announcing its decision, the trial court heard defense counsel's suggestion of a different alternative—screening of all those admitted into the courtroom—and the prosecutor's challenge to that proposal. As the Appellate Division explained, "[a]lthough the trial court did not explicitly state its reasons for rejecting the defendant's proposal, it can be implied from the trial court's findings that it accepted the People's argument that the proposed alternative would not fully protect the officers' safety."[19] *Durant*, 250

---

18. Durant does not dispute that the State advanced an interest weighty enough to satisfy the first prong of *Waller*.

19. This finding on the part of the appellate court must be "presumed to be correct." 28 U.S.C. § 2254(e)(1).

A.D.2d at 700, 672 N.Y.S.2d at 435 (citations omitted). Contrary to the premise of Durant's challenge, the United States Supreme Court has never held that the trial court must "explicitly consider alternatives on the record." *People v. Ramos*, 90 N.Y.2d 490, 503, 662 N.Y.S.2d 739, 685 N.E.2d 492 (1997) (approving partial closure). The trial court's finding that the prosecution had "justif[ied] closure of the courtroom," *see* Tr. at 334, after having "listened to ... the arguments advanced by both the People and by defense counsel" (*id.* at 333), supports the inference that the court deemed the defense's proposed alternative inadequate to protect the safety of the police officers. *See Ramos*, 90 N.Y.2d at 504, 662 N.Y.S.2d 739, 685 N.E.2d 492 (inferring that trial court, in ordering closure, determined that no lesser alternative would protect the articulated interest).

As to the fourth prong of the *Waller* test, the trial court's ruling, though brief, was nevertheless sufficient to justify the partial courtroom closure. The Supreme Court's requirement that the trial court make findings "adequate to support the closure," *Waller*, 467 U.S. at 48, 104 S.Ct. 2210, mandates only that the findings be specific enough "that a reviewing court can determine whether the closure order was properly entered." *Press–Enterprise Co.*, 464 U.S. at 510, 104 S.Ct. 819. Hence, the Second Circuit does not require explicit findings where, as here, the record supports partial courtroom closure. *See Woods*, 977 F.2d at 77–78 (holding that fourth *Waller* factor is satisfied where "in-

formation gleaned" from the record is "sufficient to support the partial, temporary closure of petitioner's trial."); *accord Bowden v. Keane*, 237 F.3d 125, 132, 133 (2d Cir.2001). As the Fourth Circuit observed in *Bell v. Jarvis*, 236 F.3d 149 (4th Cir.2000):

> [T]he *Waller* Court prescribed no particular format to which a trial judge must adhere to satisfy the findings requirement, and we read nothing in *Waller* that would require a reviewing court to evaluate the trial judge's closure order solely on the basis of the explicit factual findings and, thereby, ignore facts of record which fully support the decision and belie a claim that [the defendant's] right to a public trial was actually violated by the closure.

*Id.* at 172; *see United States v. Farmer*, 32 F.3d 369, 371 (8th Cir.1994) (specific findings not necessary where record provides sufficient support for limited closure).

■■■ Before ruling on the closure motion, the trial court in this case held a hearing that included testimony and arguments from counsel. The judge credited the testimony and concluded that the risk to the officers' safety constituted a compelling reason for partial closure. The Appellate Division thereafter reviewed the record and found it sufficient to support the lower court's ruling. The decision to order partial closure of the courtroom was based on a reasonable determination of the facts, and neither the trial court nor the Appellate Division acted "contrary to," nor unreasonably applied, clearly established federal law.[20]

---

20. Moreover, although the harmless error doctrine does not apply to courtroom closure issues, *see English v. Artuz*, 164 F.3d 105, 108 (2d Cir.1998), the Second Circuit has nevertheless cautioned against granting "disproportionate" relief for such violations. *Brown v. Kuhlmann*, 142 F.3d 529, 539, 541 (2d Cir.1998). Here, the courtroom was closed during only the testimony of the two undercover agents, who testified about the drug sale by Jerome Robinson. Durant was acquitted of participating in that sale, but was convicted of possessing the 116 vials of cocaine that were recovered from his person by Detective Savine, who testified in a courtroom open to the public. In these circum-

## CONCLUSION

For the foregoing reasons, it is the recommendation of this Court that Durant's petition for a writ of habeas corpus be granted on one of the two grounds advanced by him: i.e., the State's discriminatory exercise of a peremptory challenge in jury selection.

Any objections to the recommendations contained in this Report and Recommendation must be filed with the Honorable Frederic Block on or before *April 16, 2001.* Failure to file objections in a timely manner may waive a right to appeal the District Court order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989).

The Clerk is directed to transmit copies of this Report and Recommendation, by overnight courier, to both counsel of record.

**SO ORDERED.**

April 3, 2001.

stances, no purpose would be served by granting Durant a new trial on the possession charge on the ground that the courtroom was closed during the presentation of evidence on the one charge of which he was acquitted.