[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 23, 2008
THOMAS K. KAHN
CLERK

_____

No. 05-14627

_____

D. C. Docket No. 03-00736-CR-2-CC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

versus

JEREMIAH PRATHER,

Defendant-Appellant
Cross-Appellee,

TERRY OUTLAW,
DWAN OUTLAW,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(May 23, 2008)**

Before ANDERSON, BLACK and HILL, Circuit Judges.

PER CURIAM:

On December 9, 2003, the Government indicted Defendants-Appellants Dwan Outlaw, Jeremiah Prather, Terry Outlaw, and others for possessing and distributing marijuana and cocaine in the Atlanta, Georgia metropolitan area. The Government alleged Dwan Outlaw was the ringleader of the conspiracy, and Prather was his second-in-command. Terry Outlaw was accused of participating in the conspiracy by selling drugs.

At trial, all three appellants were convicted of various conspiracy, drug, and weapons-related charges. They now appeal their convictions and sentences, challenging (1) the legality of search warrants used to obtain evidence against them; (2) the prosecutor's use of peremptory strikes to remove African-Americans from the jury panel; (3) the admission of hearsay testimony from a non-testifying witness; (4) the sufficiency of the evidence used to convict Terry Outlaw of conspiracy and Prather and Dwan Outlaw of possessing guns in connection with drug trafficking offenses; (5) the trial court's failure to instruct the jury it could consider the prosecution's failure to call a key witness in the case; (6) the allegedly inflammatory nature of the prosecutor's closing argument; and (7) the reasonableness of Prather's and Terry Outlaw's sentences.

Although we find no reversible errors were committed at trial, the district court did not adequately explain the reasoning behind the sentences it imposed on

Prather and Terry Outlaw. Therefore, we vacate both sentences, and remand for further proceedings. In all other respects, we affirm the judgment of the district court.

## I. SEARCH WARRANTS

Prather challenges the validity of search warrants executed by police on October 11, 1999, October 12, 2000, and November 14, 2003. He contends the warrants were not supported by probable cause, were overly broad, and did not specifically authorize police to seize firearms.[1] For these reasons, he argues, the district court erred by admitting into evidence the drugs, guns, and other paraphernalia obtained during the searches.

*A. Searches*

We begin with a brief summary of the challenged searches, and the facts supporting each warrant issued.

*1. October 11, 1999*

On October 11, 1999, after having observed marijuana transactions at 395 Woodlawn Avenue, Unit 1, on three occasions within a preceding four-month period, Atlanta police officers obtained a warrant entitling them to search the

---

[1] Prather recounts details regarding several other searches in his brief, but appears to argue only the fruits of these three searches should have been suppressed.

premises.  Although the warrant did not authorize a search for handguns, officers seized a gun, cash, and a small bag of marijuana.

*2.  October 12, 2000*

On October 12, 2000, police officers obtained a warrant to again search 395 Woodlawn Avenue, Unit 1, for "cocaine, money from the sales of cocaine and any and all items used for the sale, distribution, and manufacturing of cocaine."  The warrant did not authorize a search for weapons.  According to the affidavit supporting the warrant, undercover police officers had made a controlled purchase of crack cocaine at the same location two weeks earlier.

When the warrant was executed, police seized marijuana and cocaine, and arrested a number of persons, including Prather and co-conspirator Kelly Roberts.  At that time, keys to Units 1 & 2 of 395 Woodlawn were found in Prather's possession.

After searching Unit 1, officers noticed the "odor of marijuana" emanating from Unit 2.  Officers asked Prather for permission to search the unit; when he refused, they obtained a warrant authorizing the seizure of marijuana, money from sales of marijuana and any and all items used for the sale, distribution, and manufacturing of marijuana from Unit 2.  Officers entered the unit and seized marijuana and cocaine.

4

*3. November 14, 2003*

On November 7, 2003, police filed an affidavit seeking a search warrant for 1285 North Avenue in connection with an ongoing investigation of Dwan Outlaw. Within 72 hours of the affidavit's filing, an undercover agent had made a controlled purchase of marijuana from Dwan Outlaw at the North Avenue residence. According to the affidavit, the Atlanta Police Department had also received a report indicating Dwan Outlaw was selling drugs at the residence.

The warrant issued on November 14, 2003, and authorized officers to search for drug records, drug proceeds, communications records, telephone records, drug scales, drug paraphernalia, and "other indicia of illegal narcotics." When law enforcement officers executed the warrant, they found large quantities of hidden drugs, drug paraphernalia (scales and a cooking pot), a gun, and ammunition.

*B. Fourth Amendment Challenge*

We review the district court's denial of a motion to suppress under a mixed standard, "reviewing the district court's findings of fact for clear error and its application of law to those facts *de novo*." *United States v. Lyons*, 403 F.3d 1248, 1250 (11th Cir. 2005). All facts must be viewed in the light most favorable to the prevailing party, *United States v. Heard*, 367 F.3d 1275, 1278 (11th Cir. 2004), which in this case is the Government.

5

The Fourth Amendment requires search warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized," U.S. Const. amend. IV, in order to protect individuals from being subjected to general, exploratory searches. *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022, 2038 (1971); *United States v. Khanani*, 502 F.3d 1281, 1289 (11th Cir. 2007). Therefore, "when a police officer engages in a search outside of the proper scope (whether that scope be defined by a warrant or by circumstances), evidence obtained in that search may be excluded." *United States v. Hendrixson*, 234 F.3d 494, 497 (11th Cir. 2000).

Prather argues the search warrants executed October 11, 1999, October 12, 2000, and November 14, 2003, were issued without probable cause and were impermissibly broad because they did not specify the items to be seized. However, each warrant was supported by affidavits which contained facts regarding recent controlled purchases of drugs made by undercover agents or, in the case of the October 11, 1999 warrant, recent arrests of persons exiting the residence who possessed marijuana. The facts detailed in the affidavits provided probable cause to believe drug activity was occurring at the residences in question, and justified the issuance of the warrants. The warrants were broad with respect to their inclusion of all drug-related items; however, because the police had probable

6

cause to believe drug dealing was occurring at the locations being searched, the scope of the warrants appropriately matched the scope of police suspicion.

Prather contends police also exceeded the scope of the warrants by seizing guns during the October 11, 1999, and November 14, 2003 searches. Although neither warrant specifically authorized the seizure of weapons, the police did not err in confiscating weapons when they found them. When law enforcement officers stumble across hidden guns during a lawful search for drugs, they are allowed to draw the reasonable inference that the guns may be related to drug trafficking occurring at the location. *United States v. Smith*, 918 F.2d 1501, 1509 (11th Cir. 1990) (finding firearms not named in a warrant were properly seized during search of drug house as "tools of the trade"). That is precisely what the police did in this case.

The district court did not err by denying Prather's motion to suppress the fruit of the search warrants executed October 11, 1999, October 12, 2000, and November 14, 2003; therefore, we affirm the district court's denial of the suppression motion and the subsequent admission at trial of evidence obtained from the challenged searches.

## II. *BATSON* CHALLENGE

Next, Prather and Terry Outlaw contend their right to equal protection was violated when the Government exercised six of its seven peremptory strikes to exclude five of the nine black jurors on the venire panel, along with one proposed alternate juror. *See Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

When a court assesses a defendant's challenge to a peremptory strike, it engages in a three-step inquiry. First, the trial court must determine whether the defendant has made a *prima facie* showing the prosecutor exercised a peremptory challenge on the basis of race. *Rice v. Collins*, 546 U.S. 333, 338, 126 S. Ct. 969, 973 (2006). Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. *Id.* Third, the court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771 (1995).

During voir dire, defendants objected immediately to the prosecutor's peremptory strikes of African Americans, contending they were racially motivated. Although the judge did not explicitly find Appellants had made a *prima facie*

8

showing, he required the prosecutor to provide an explanation for each strike made.

In response to the trial court's inquiry, the Government represented the jurors had been stricken for the following reasons: one had a son and brother who had been convicted of drug offenses; another worked at the same General Motors plant as a potential defense witness in the case; and a third had health problems and had fallen asleep during voir dire. The prosecutor explained she had stricken two additional jurors after sensing they might be biased against the Government based on their demeanor when describing their personal histories. A final juror was stricken because her only hobby was "teaching in the ministry," an activity the prosecutor believed might indicate a commitment to rehabilitating criminals rather than punishing them.

After hearing the Government's explanation for its strikes, the district court stated, "The government has given nondiscriminatory race-neutral reasons for exercising its strikes." The defendants did not proffer any additional evidence to rebut the Government's explanation, and without further comment from the court or counsel, the trial commenced.

Appellants take the position that this Court should reverse their convictions because the district court failed to make on-the-record findings regarding the

credibility of the prosecutor's explanations. They argue the district court's failure to discuss the explanations proffered by the prosecutor amounts to a failure to determine whether their equal protection rights were violated. We disagree.

Recently, the Supreme Court confronted a case in which a district court had allowed a trial to proceed without "making a specific finding on the record" concerning the credibility of a prosecutor's proffered reason for striking a potential juror. *Snyder v. Louisiana*, — U.S. —, 128 S. Ct. 1203, 1209 (2008). In that case, after the prosecutor offered two racially-neutral reasons for striking a black juror, the trial court accepted the explanations without comment. *Id.* at 1208. After determining one of the two proffered reasons was plainly incredible, the Supreme Court reversed Snyder's conviction, concluding that it could not tell from the transcript how much weight the trial court had placed on the prosecutor's pretextual explanation. *Id.* at 1211-12. The Supreme Court did not reverse Snyder's conviction because the district court had failed to explain itself clearly, but because it was unclear whether the district court's finding rested on a plausible or implausible explanation for the strike.

None of the reasons the Government offered for its strikes in this case is inherently incredible. Most jurors were stricken for prudent reasons—a serious health problem, knowledge of potential witnesses, or close familial connections to

10

persons convicted of similar crimes. Although the prosecutor's reasons for striking other jurors were less concrete, they were not inherently suspicious.

Prather and Terry Outlaw focus on the district court's failure to articulate reasons for its decision that no discrimination had taken place; however, once the Government had come forward with a race neutral explanation for its strikes, the Appellants bore the burden of proving purposeful discrimination. *Purkett*, 514 U.S. at 768, S. Ct. at 1771. During jury selection, defense counsel made no effort to rebut the prosecutor's explanations with evidence and did not argue the reasons the Government provided were pretextual. Counsel asked to preserve an objection to the peremptory strikes, but they did not argue the *Batson* issue further.

After listening to the prosecutor's explanation for her strikes, the district court noted for the record the prosecutor had offered race neutral explanations. The court then proceeded to impanel the jury. In the absence of any additional argument or evidence from Appellants, the court did not err in concluding Appellants had not met their burden of proving the strikes were based on the prospective jurors' race, rather than on their personal circumstances.

### III.  *CRAWFORD* CHALLENGE

Terry Outlaw and Dwan Outlaw contend their Sixth Amendment right to confrontation was violated when the Government asked Detective S. H. Kim to

repeat the out-of-court statements to him made by Lydia Headspeth (a non-testifying co-conspirator) regarding the scope of the conspiracy and Dwan Outlaw's role in it. Appellants did not object to Kim's testimony in the trial court; therefore, we review for plain error only. *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005).[2]

At trial Detective Kim testified he interviewed co-defendant Lydia Headspeth at police headquarters in February 2002, regarding Dwan Outlaw's alleged involvement in the conspiracy. During direct examination, the Government elicited details regarding what transpired:

> Gov't:  I'm not going to ask you to read the statement, it may be something we end up doing later, but based on this statement that you took from Ms. Headspeth, what did you learn with respect to 1645 Derry Avenue and Mr. Dwan Outlaw?
>
> Kim:  Basically, confirmed the information that I received. It was confirmed through Lydia Headspeth in the statement that she had made.
>
> Gov't:  Did she tell you anything about Dwan Outlaw and his connection to 1645 Derry Avenue?

---

[2] The Government argues Appellants invited the alleged error by asking another law enforcement officer, Alan Abercrombie, whether Headspeth had ever implicated Dwan Outlaw in the sale of drugs. Appellants' counsel asked Abercrombie whether Headspeth had ever accused Outlaw of selling drugs, but specifically directed the witness not to repeat the content of Headspeth's statements. Given the limited nature of defense counsel's inquiry, we cannot conclude the error was invited.

Kim:       Yes.

Gov't:     What did she tell you?

Kim:       Based on her—our conversation, she advised that Mr.
           Outlaw would, number one, pay for the rent of the house.
           Also he will [sic] bring large quantities of narcotics to
           that location. I believe on the statement it says eight to
           ten kilos of cocaine. I don't know the time frame, I don't
           know if it's a week or a month. And he would actually
           cook the powder cocaine into crack cocaine and would
           distribute it from that location and also from other
           location that is on the chart [sic].

Gov't:     Did she make any references to 1469 Simpson Road and
           the connection that location had to Derry Avenue and
           Dwan Outlaw's drug distribution?

Kim:       Yes. On the statement, like I said, he would cook the
           powder cocaine to crack cocaine, cook it at Derry
           Avenue. And he would also distribute or sell from that
           location. But also would take it to, I believe it's 1469
           Simpson Road, and he will also distribute or sell from
           that location also. And then the statement is a little more
           detailed about the vehicles and the process of how he
           went about, done the whole operation.

Gov't:     Did you ask her about 395 Woodlawn Avenue?

Kim:       Yes.

Gov't:     And in sum and substance what did you learn about 395
           Woodlawn Avenue?

Kim:       If I could see that statement one more time, but I believe
           it's–

13

Gov't:      Hold on, I'm showing it to you.

Kim:        Yeah, right from the start, on the statement on the front of the sheet, she advised that she had gotten arrested from 395 Woodlawn selling narcotics for Dwan Outlaw and after a certain period has passed Mr. Outlaw for the house on Derry Avenue, then she was back selling narcotics for him again.

A transcript of the interview between Kim and Headspeth was entered into evidence as Government's Exhibit 17.[3] Defendants' counsel did not object to Kim's testimony or to the admission of Exhibit 17.[4]

Under plain error review, "[a]n appellate court may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights." *Rodriguez*, 398 F.3d at 1298. Testimonial statements of absent witnesses are admissible at trial only when a defendant has had a prior opportunity to confront the unavailable witness. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369 (2004). It is undisputed that neither Terry Outlaw nor Dwan Outlaw was able to cross-examine

---

[3] A second copy of the interview transcript was admitted into evidence as Government Exhibit 57. Exhibit 57 was a photocopy of the statement police found during a search of Dwan Outlaw's mother's home. Both Exhibits 17 and 57 were published and sent out with the jury during their deliberations.

[4] Appellants contend counsel did not object to the admission of the exhibit or to Kim's testimony because the Government had represented it would be calling Headspeth as a witness later in the proceedings.

14

Headspeth before or at trial and her statements, given to a police officer during a custodial interview, were incontrovertibly testimonial. Consequently, it was plainly erroneous to admit the statements into evidence at trial. *Cf. United States v. Arbolaez*, 450 F.3d 1283, 1291 (11th Cir. 2006) (finding "error" that was "plain"—but not "plain error"—in admission of statement obtained through custodial interrogation).

That leaves the question whether the error affected Dwan Outlaw's or Terry Outlaw's substantial rights. For an error to affect substantial rights, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *United States v. De La Garza*, 516 F.3d 1266, 1269 (11th Cir. 2008) (quoting *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1778 (1993)).

With respect to Terry Outlaw, there is little in Headspeth's statements to prejudice him. Headspeth did not mention Terry Outlaw to Detective Kim at all. She did, however, identify Terry Outlaw's residence, 395 Woodlawn Avenue, as a drug house. Beyond that tenuous link, there was no connection between Headspeth's testimony and Terry Outlaw's conviction. As we discuss at greater length below (*see* § III.A, *infra*), Terry Outlaw was convicted based on the testimony of Detective Kim and co-conspirator Kelly Roberts—not on the hearsay

testimony of Lydia Headspeth. Headspeth's statements, while wrongly admitted, did not prejudice Terry Outlaw's substantial rights by affecting the outcome of his trial.

Slightly more difficult is the question whether Headspeth's statements made the difference between conviction and acquittal for Dwan Outlaw. Because Headspeth's statements directly implicated Dwan Outlaw in the sale of narcotics at several different locations, her testimony was plainly prejudicial. In order to decide whether Headspeth's statements determined the outcome of the trial—that is, whether the result would have been different but for the admission of the hearsay statements—we must consider what other evidence of Dwan Outlaw's guilty was placed before the jury. *See Arbolaez*, 450 F.3d at 1291.

In the course of a three-week trial, the Government presented evidence of numerous drug seizures linked to Dwan Outlaw. On November 11, 2000, an officer stopped Dwan Outlaw's vehicle and recovered crack cocaine from his pocket. On March 20, 2002, officers searching 1391 Kennesaw Drive found documents suggesting the residence belonged to Dwan Outlaw. From that location, officers seized large quantities of cocaine, along with weapons and drug paraphernalia. On April 25, 2002, a search of Dwan Outlaw's home at 3167 Sunnyford Lane led to the seizure of several firearms and marijuana. On

16

November 6, 2003, an undercover officer purchased $500.00 of marijuana from Dwan Outlaw, and on November 14, 2003, Dwan Outlaw was arrested at 1285 North Avenue, where officers found drug cooking equipment and a firearm. Finally, Kelly Roberts testified extensively regarding Dwan Outlaw's leading role in the drug conspiracy. In short, the evidence from which a jury could have found Outlaw guilty was overwhelming. In light of that evidence, we cannot conclude Dwan Outlaw's substantial rights were prejudiced by the improper admission of Headspeth's out-of-court statements.

## IV. SUFFICIENCY OF THE EVIDENCE

Terry Outlaw challenges the sufficiency of the evidence used to convict him of conspiracy; Prather and Dwan Outlaw challenge the sufficiency of the evidence supporting their convictions for possessing weapons in connection with a drug trafficking offense. We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in the Government's favor. *United States v. Schlei*, 122 F.3d 944, 952-53 (11th Cir. 1997). We must affirm unless no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

*A. Conspiracy*

17

To prove conspiracy, the Government must show an agreement between two or more persons to possess and distribute drugs illegally. *United States v. Lyons*, 53 F.3d 1198, 1201 (11th Cir. 1995). It must also show Terry Outlaw knowingly and voluntarily joined or participated in the agreement. *Id.* At trial the Government presented evidence Terry Outlaw was present during the March 20, 2002 search of 390 Woodlawn Avenue, where police found cocaine base and marijuana hidden in a vent. Moreover, co-conspirator Kelly Roberts testified Terry Outlaw was in charge of drug sales at the residence for almost one year.

In arguing the evidence was insufficient to prove his guilt, Outlaw discounts Roberts' testimony, contending the jury was not entitled to believe him because he was a "hostile" drug addict. Although Outlaw acknowledges that credibility is a matter for the jury to assess, he contends that Roberts was so unreliable, and some of his testimony so absurd, that the Court should find as a matter of law the jury was not entitled to believe him.

We are not persuaded. At trial, defense counsel impeached Roberts thoroughly, pointing out inconsistencies in his testimony and highlighting the reasons he may have had for offering false testimony. Nevertheless, the jury credited his testimony, as it was entitled to do. Furthermore, Outlaw's sufficiency challenge ignores completely the evidence recovered in the March 20 search. As

18

the Government properly notes, although "mere presence, guilty knowledge, even sympathetic observation have all been held by this court to fall short of the proof required" for conspiracy, Outlaw's presence at 390 Woodlawn at the time the search warrant was executed is not a fact without legal relevance. *Lyons*, 53 F.3d at 1201. The jury was free to infer from Terry Outlaw's presence at the drug house that he was a conspirator. *Id.* ("Presence at such drug trafficking . . . raises a permissible inference of participation in the conspiracy."). While the inference alone would be insufficient to convict him, "the inference is a material and probative factor that the jury may consider in reaching its verdict." *Id.* Combining Roberts's testimony with the evidence recovered during the March 20 search, the evidence was more than adequate to support the jury's verdict. Consequently, we affirm Terry Outlaw's conviction on the conspiracy charge.

*B. Gun Possession*

Prather and Dwan Outlaw both contend the evidence adduced at trial was insufficient to link their possession of guns to drug trafficking offenses, as required by 18 U.S.C. § 924(c)(1)(A). That statute applies to:

> any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States,

uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm . . . .

*United States v. Suarez*, 313 F.3d 1287, 1291 (11th Cir. 2002). Conviction under § 924(c) requires the prosecution to establish the firearm "helped, furthered, promoted, or advanced the drug trafficking." *United States v. Timmons*, 283 F.3d 1246, 1252 (11th Cir. 2002). In other words:

> The government must clearly show that a firearm was possessed to advance or promote the commission of the underlying offense. The mere presence of a firearm in an area where a criminal act occurs is not a sufficient basis for imposing this particular mandatory sentence. Rather, the government must illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or promote the criminal activity.

*Id.* at 1252.

Prather and Dwan Outlaw contend there was insufficient evidence to show they possessed guns "in furtherance of" the drug conspiracy. They concede the Government proved Prather possessed a weapon and Dwan Outlaw had access to one; however, they contend no evidence was adduced showing they used the firearms to forward, promote, advance, or facilitate the conspiracy. We assess the evidence against each in turn.

### 1. *Jeremiah Prather*

The evidence against Prather came entirely from Kelly Roberts, who testified he had seen Prather at the drug houses with guns on three to five

occasions. According to Roberts, sometime in 2002, Prather began buying "Glocks," which he would wear in holsters over his shoulders. On several occasions, Prather "play[ed] with folks" who came to 395 Woodlawn by coming up behind them dressed in black, pulling a gun out of its holster, and waving it in the air. Roberts testified Prather wore his guns when he made drug deliveries and had the weapons available to him at the drug houses during transactions.

In the face of this detailed testimony, Prather merely asserts Roberts' testimony was not credible and the jury should not have believed it. However, it is axiomatic that credibility determinations are the sole province of the jury, *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999), and this Court must "resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict," *United States v. Medina*, 485 F.3d 1291, 1296 (11th Cir. 2007). Despite potential problems with Roberts' credibility, the jury was entitled to believe Roberts' testimony that Prather had used a gun to scare drug customers at the various residences—a clear example of using a weapon "in furtherance" of drug trafficking.

*2. Dwan Outlaw*

With respect to Dwan Outlaw, the Government produced evidence in two forms. First, police testified to recovering two firearms during a search of 3167

Sunnyford Lane. One gun was found on the top shelf of a bedroom belonging to Dwan and another gun was found between the cushions of the living room couch. Both weapons were registered to Dwan Outlaw's fiancee, Cicely Ware.[5] The same search yielded evidence of drug cooking materials and a small amount of marijuana.

Second, Kelly Roberts testified he had seen Dwan Outlaw with guns on two occasions. Roberts described one of these incidents in detail, explaining that when he once tried to extricate himself from the conspiracy, Outlaw drove past him in a truck, holding a gun aloft so Roberts would see it. Roberts understood the gesture as a threat.

"A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." *United States*, 513 F.3d 1293, 1299 (11th Cir. 2008) (quoting *United States v. Byrd*, 403 F.3d 1278, 1288 (11th Cir. 2005)). The evidence that Dwan Outlaw used a weapon in connection with drug trafficking may not have been overwhelming, but it was more than sufficient to support the jury's verdict. From the evidence presented by police officers, the jury was free to conclude Dwan had stored one or more guns for protection and use at the location where he cooked crack cocaine.

---

[5] As a convicted felon, Dwan Outlaw could not legally purchase a weapon.

Moreover, from Roberts' testimony, the jury was free to conclude that, on at least one occasion, Dwan Outlaw had used a weapon to threaten Roberts, in order to prevent him from extricating himself from the conspiracy. Consequently, we affirm Dwan Outlaw's conviction for violating 18 U.S.C. § 924(c)(1)(A).

## V. FAILURE TO PROVIDE JURY INSTRUCTION

Next, Dwan Outlaw challenges the district court's failure to provide the jury with the following proposed instruction regarding the Government's failure to call Lydia Headspeth as a witness:

> You have heard evidence about a witness who has not been called to testify. The defense has argued that the witness could have given material testimony in this case and that the government was in the best position to produce this witness.
>
> If you find that this uncalled witness could have been called by the government and would have given important new testimony, and that the government was in the best position to call him [sic], but failed to do so, you are permitted, but you are not required, to infer that the testimony of the uncalled witness would have been unfavorable to the government.
>
> In deciding whether to draw an inference that the uncalled witness would have testified unfavorably to the government, you may consider whether the witness' testimony would have repeated other testimony and evidence already before you.

At trial, the Government took the position the instruction was inappropriate because the witness in question "were not necessarily *per se* available to the

23

government" because "[t]hey had Fifth Amendment rights and . . . it [would be] unlawful and impermissible to call a witness just to have them [sic] invoke their Fifth Amendment in the presence of the jury for them to draw an inference."[6] The court declined to give the requested instruction.

We review a district court's refusal to give a particular jury instruction for abuse of discretion. *United States v. Eckhardt*, 466 F.3d 938, 947-48 (11th Cir. 2006). Under this deferential standard of review, we will reverse only if "we are left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations." *Id.*

A district court's failure to give a requested jury instruction is an abuse of discretion when the requested instruction (1) was correct, (2) was not substantially covered by the charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense. *Eckhardt*, 466 F.3d at 947-48.

Appellants' proposed instruction was drawn from model jury instructions, *see* Sand et al., *Modern Fed. Jury Instructions-Criminal* § 6.04, Instruction 6-5 (2007); however, the commentary to those instructions suggests a missing witness

---

[6] On appeal, the Government contends for the first time that Lydia Headspeth could not be called as a trial witness because she had committed a new crime and was on the lam when Appellants' trial took place. (Red Brief at 29, n. 1.)

instruction would have been inappropriate under the circumstances presented by this case:

> When a witness is equally available, or equally unavailable to both parties, the justification for giving a missing witness instruction is substantially changed. In such circumstances, the court clearly should not instruct the jury that an inference may be drawn only against one side. This includes situations where the witness has indicated that he would assert his Fifth Amendment right not to testify if called. Thus, if a witness is physically available to both parties, but has been cooperating with the defense or is under government subpoena, it is inappropriate to give the missing witness instruction recommended in Instruction 6-5.

*Id.* § 6.04, Instruction 6-7 cmt. (collecting cases).

Our Circuit case law supports the same result. Only "[w]hen a witness *is peculiarly within the control of one party*, and the witness' testimony would elucidate facts in issue, [is] an instruction . . . appropriate regarding the permissible inference which the jury may draw from the party's failure to call the witness." *United States v. Nahoom*, 791 F.2d 841, 846 (11th Cir. 1986) (emphasis added). In this case, the district court found Headspeth was not particularly within the control of the Government. Because neither party called her to testify, a missing witness instruction would have invited the jury to draw an improper inference in Appellants' favor. Consequently, the district court did not abuse his discretion by failing to give the requested instruction.

## VI.  PROSECUTORIAL MISCONDUCT

25

Next, Prather challenges the prosecutor's closing argument, during which she referred to the death of a local police officer and suggested to the jury that additional officers' lives would have been endangered had police continued to gather evidence against Appellants before proceeding to trial. Prather contends her statements tainted the jury and that his conviction should therefore be reversed.

We will reverse a defendant's conviction on the basis of prosecutorial misconduct only where the prosecutor's "remarks (1) were improper and (2) prejudiced the defendant's substantive rights." *United States v. O'Keefe*, 461 F.3d 1338, 1350 (11th Cir. 2006) (emphasis added). A defendant's substantial rights are prejudicially affected only when a reasonable probability arises that, but for the prosecutor's statements, the outcome of the trial would have been different. *Id.*

The Government does not defend the prosecutor's comments, but points out the trial judge, acting *sua sponte*, admonished the jury to disregard the prosecutor's remark, and not allow it to factor into their decision. Having reviewed the Government's harmless error argument in the context of the entire record, *United States v. Blakey*, 14 F.3d 1557, 1561 (11th Cir. 1994), we agree that the judge's curative instruction was sufficient. Although the prosecutor's

26

comment was off-base, it was brief and was almost immediately corrected by the district court. The prosecutor did not misstate the burden of proof, which she emphasized required proof "beyond a reasonable doubt." Moreover, in the context of a trial in which the jury heard substantial evidence of Prather's guilt, the comment was not one likely to have influenced the jury's verdict, much less altered it. Consequently, the error was harmless; the district court did not err by denying Prather's motion for a mistrial.

## VII. SENTENCING

The district court imposed a sentence on Terry Outlaw that fell within the recommended guideline range and imposed a below-guideline sentence on Jeremiah Prather. Terry Outlaw appeals his sentence, contending it was unreasonably high; the Government appeals Prather's sentence, contending it was unreasonably low. Unfortunately, we cannot determine whether the sentences were reasonable because the district court failed to adequately explain the reason for the sentences it selected. Consequently, we reverse and remand both sentences for further consideration by the district court.

In determining what sentence is reasonable in any given case, the district court must consider the correctly calculated advisory guideline range and the factors set forth in 18 U.S.C. § 3553(a). *United States v. Valnor*, 451 F.3d 744,

749 (11th Cir. 2006). The parties agree the district court properly calculated the relevant guideline ranges for both Prather and Terry Outlaw, therefore we need not consider that issue.

We review sentences for two kinds of reasonableness: procedural and substantive. First, we review the sentence to

> ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.

*Gall v. United States*, — U.S. —, 128 S. Ct. 586, 597 (2007); *United States v. Pugh*, 515 F.3d 1179, 1190 (11th Cir. 2008). If no procedural errors have been committed, we assess the substantive reasonableness of the sentence under an abuse of discretion standard. *Gall*, 128 S. Ct. at 597.

In order for this Court to affirm that a sentence is reasonable, it must be clear that the district court considered relevant sentencing factors. Although a sentencing judge need not make explicit his consideration of *all* relevant factors, the judge must "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own

28

legal decision making authority." *United States v. Rita*, — U.S. —, 127 S. Ct. 2456, 2468 (2007); *Gall*, 128 S. Ct. at 597.

The district court sentenced Jeremiah Prather on August 16, 2005, and Terry Outlaw on September 21, 2005, without the benefit of the Supreme Court's guidance in *Rita* or *Gall*.[7] Having reviewed the transcript of both sentences, we conclude the district court failed "to adequately explain the chosen sentence" for either Prather and Terry Outlaw. *Gall*, 128 S. Ct. at 597. District courts deserve great deference in deciding sentences; however, the sentences must be adequately explained. *Rita*, 127 S. Ct. at 2469 ("By articulating reasons, even if brief, the sentencing judge not only assures reviewing courts (and the public) that the sentencing process is a reasoned process but also helps that process evolve.").

By remanding these sentences to the district court, we do not judge the reasonableness of either sentence's length; we ask only for more explanation. On remand, the district court should exercise its reasoned discretion and impose whatever sentence it deems appropriate under § 3553(a).

---

[7] *Rita* was issued on June 21, 2007. *Gall* issued December 10, 2007, the day before oral argument was held in this case.

## VIII. CONCLUSION

For the reasons discussed above, we conclude the district court did not err when it admitted evidence obtained through validly-executed search warrants; found Appellants had failed to prove the Government's use of peremptory strikes was racially motivated; determined sufficient evidence supported the jury's conviction of Terry Outlaw for conspiracy and Prather and Dwan Outlaw for possessing guns in connection with drug trafficking offenses; failed to provide a missing witness instruction; and denied Appellant's motion for a mistrial premised on the allegedly inflammatory nature of the prosecutor's closing argument. Furthermore, although the district court erred by admitting hearsay testimony from a non-testifying witness, the error did not affect Appellants' substantial rights and therefore is not grounds for reversal. Therefore, we affirm the district court's judgment with respect to each of these matters. However, we vacate and remand the sentences of Terry Outlaw and Jeremiah Prather on procedural grounds. On remand, the district court should explain more fully its reasons for imposing the sentences it selected.

**AFFIRMED IN PART, REVERSED IN PART; REMANDED FOR FURTHER PROCEEDINGS.**