**MODIFIED NOVEMBER 18, 2013**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 12, 2013

Lyle W. Cayce
Clerk

No. 12-31203

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

EUGENE THOMPSON,

Defendant–Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before SMITH, DENNIS, and HIGGINSON, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Eugene Thompson, as a member of a six-person drug conspiracy, was convicted by a jury of violations of federal drug and gun laws. He appeals the denial of his *Batson* challenge and questions the sufficiency of the evidence. Finding

no reversible error, we affirm.

## I.

Thompson faced four counts. He was charged in Count One with conspiracy to distribute and possess with intent to distribute more than 280 grams of crack cocaine, in violation of 21 U.S.C. § 846; in Count Two with possession with intent to distribute crack cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and (C) and 18 U.S.C. § 2; in Count Three with possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)-(1)(A)(I) and 18 U.S.C. § 2; and in Count Four with possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 942(a)(2).

During *voir dire*, Thompson challenged the government's decision to use five of its seven peremptory strikes against black prospective jurors (Jurors 4, 23, 25, 26, and 37) under *Batson v. Kentucky*, 476 U.S. 79 (1986). Assuming *arguendo* that Thompson had established a *prima facie* case of discrimination, the district court asked the prosecutor to articulate the reasons for the strikes. For Jurors 23 and 37, the government justified its decision solely on its observations of the juror's demeanor[1] during voir dire.[2] For Jurors 4, 25, and 26, the

---

[1] References to a juror's demeanor include any of the following observations: a juror's looking at, acknowledging, or smiling at one party but not the other; a juror's inattentiveness, or attentiveness to one side but not the other; a juror's lack of eye contact; a juror who exaggerates; a juror's apparent nervousness; a juror who exhibits a hostile demeanor; a juror's physical appearance; and a juror's facial expressions. *See* KEVIN F. O'MALLEY, JAY E. GRENIG & HON. WILLIAM C. LEE, 1 FEDERAL JURY PRACTICE AND INSTRUCTIONS § 4:9 (6th ed. 2013) (citing cases).

[2] The government noted that Juror 23 "sat there, looking disinterested and annoyed. He was stern when he was awake. His arms were folded." The government similarly noted that Juror 37 "sat there, looking lost. He did something like this—indicates—with his—my sense is he was lost and wasn't engaged." The record does not further clarify what gesture the government claims Juror 37 made.

government relied on both observations of the juror's demeanor[3] and other perceived sources of bias toward the government.[4]

After hearing each of the prosecutor's justifications, the court gave Thompson an opportunity to argue that those reasons were pretext for discrimination. Defense counsel disputed the government's characterizations of the jurors' demeanor[5] and the other stated justifications.[6] Having been able to witness the

---

[3] The government noted that Juror 4 "throughout the case . . . sat there . . . look[ing] perturbed throughout the whole process." The government likewise observed that Juror 25 "sat there with his arms folded . . . wearing a mean look on his face." The government noted that "one of [its] agents said that [Juror 25] had glared at [the agent]." The government also noted Juror 26's demeanor as a basis to strike: "In addition, I mean, the demeanor, when he sat there, looking down. And we actually saw him smirk at one point in response to an answer that someone else made."

[4] The government additionally justified striking Juror 4 because "her son was arrested for selling weed." The government was consequently "concern[ed] with her sympathizing with the defendant here on trial." Likewise, the government additionally justified striking Juror 25 for his prior incident with law enforcement: "[W]hen he was brought up to the stand, he told the judge that he had been arrested and had spent the night in jail on a contraband use charge." According to the government, "the explanation he gave was it was his right to do it. So there was a conflict of whether he felt he should have been in jail, could have harbored some resentment against the government." In addition to his demeanor, the government struck Juror 26 because he was employed as a postal server. Because the U.S. Attorney's Office prosecutes post office employees, the government claimed to have "had problems with them in the past as jurors."

[5] Defense counsel disagreed with the government's observation of Juror 4's demeanor: "I did not observe the characteristics that Mr. Carter displayed." Defense counsel likewise disagreed with Juror 23' s demeanor: "I did not observe these characteristics of No. 23. He did seem an honest, intelligent man, who has currently served as an organist at his church." Similarly with Juror 25's demeanor: "I looked at the same gentleman. I did not notice him glaring at the agent at all." And Juror 26: "And, again, we have a smirk, we have an awe, we have a glare. It's all pretextual type innuendo, which every last juror if you look may have sneezed or yawned or made a facial expression. Therefore, all of these challenges are not valid for race." And, finally, a similar disagreement with an assessment of Juror 37's demeanor: "I did not notice him glaring or looking."

[6] Defense counsel also indicated that the government's second rationale with respect to Juror 4 applied to other white jurors who were not struck: "Additionally, there were multiple white jurors who indicated that family members had been subject to criminal convictions and/or arrests. Those jurors were not subject to the same strikes." For Juror 26, defense counsel argued that there was no indication on the record that he was biased on account of his posi-

(continued...)

*voir dire* and assess each side's credibility, the court denied the *Batson* challenge, finding each of the government's proffered reasons credible. Thompson appeals the denial of his *Batson* challenge.

Following this exchange, in light of the fact that the defense had used all eleven of its peremptory challenges on white jurors, the government made a reverse *Batson* challenge. Just like the government, defense counsel justified some of its peremptory challenges solely on the basis of demeanor.[7] As with the government, the district court credited the defense's observations of the jurors as facially-neutral, non-pretextual justifications. The court, however, found two of the justifications given by defense counsel to be pretextual.[8] Thompson does not appeal the grant of the reverse *Batson* challenge.[9]

After the close of the government's case, Thompson moved for a judgment of acquittal, which, after hearing arguments, the district court denied. The jury found Thompson guilty on all counts. Thompson appeals the denial of the motion for acquittal.

---

[6] (...continued)
tion as a postal employee: "[T]here was no question asked in this session or in any part of the voir dire process when you addressed whether the potential juror was disposed or biased as a postal employee. There was no reference to him or anyone in his immediate circle being a victim of an investigation and/or conviction."

[7] For Juror 19, defense counsel observed that he "was not engaged . . . not necessarily disinterested, but didn't seem to follow the direction and the instruction in a way that he was engaged in the jury selection process." Similarly, defense counsel "didn't find [Juror 30] to be paying close attention and following." Likewise, contrary to the government's assessment, defense counsel "didn't see [Juror 36] acting and following closely as the other ones, the other jurors in that particular panel were."

[8] The district court rejected defense counsel's justifications for striking Jurors 17 and 20. For Juror 17, defense counsel "felt that she would have superior ability to influence the potential jurors based on her status as an administrator at Delgato [sic] Community College." For Juror 20, defense counsel believed that "as a potential homemaker, that, if the trial were to last longer than two days, perhaps it would be an inconvenience on her."

[9] Because Thompson did not raise this issue on appeal, we consider the argument to be waived. *State v. Thames*, 214 F.3d 608, 611 n.3 (5th Cir. 2000).

## II.

In *Batson v. Kentucky*, 476 U.S. 79, 93–98 (1986), the Court outlined a three-part framework for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause. To raise a successful *Batson* challenge, a defendant must first make a *prima facie* showing that the prosecutor used a peremptory challenge to strike a juror on the basis of his race. Second, if the defendant has made such a showing, the prosecution must then offer a race-neutral basis for the strike. Finally, the district court must determine whether the defendant has carried his burden of proving purposeful discrimination.

A district court makes a finding of fact when it determines whether a prosecutor has purposively discriminated on the basis of race in striking a juror. *See Hernandez v. New York*, 500 U.S. 352, 367 (1991). This court does not overturn such factual findings absent clear error. *See United States v. Bentley-Smith*, 2 F.3d 1368, 1372 (5th Cir. 1993). These factual findings warrant great deference, because the district court "observ[es] the voir dire, know[s] the layout of the courtroom better than a written description can provide, and [is] able to consider the demeanor of the prosecutor." *United States v. Turner*, 674 F.3d 420, 436 (5th Cir.), *cert. denied*, 133 S. Ct. 302 (2012).[10] We review the government's proffered race-neutral explanation as a legal issue *de novo*. *United States v. Williams*, 264 F.3d 561, 571 (5th Cir. 2001).

Thompson has raised *Batson* challenges on all of the five black jurors struck. To succeed on his *Batson* challenge, however, he only needs to show that

---

[10] *See also Hernandez*, 500 U.S. at 367 ("[I]f an appellate court accepts a trial court's finding that a prosecutor's race-neutral explanation for his peremptory challenges should be believed, we fail to see how the appellate court nevertheless could find discrimination. The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review.").

the prosecutor struck one juror on the basis of race.[11]

We do not need to address whether Thompson has sufficiently established a *prima facie* case of discrimination. The government's offer of race-neutral reasons removes that question from our review.[12]

Turning to *Batson*'s second step, for two of the five black jurors struck, the government justified its decision solely[13] on its observations of the jurors' demeanor during *voir dire*. For the other three black jurors, the government justified its decision to strike on both observations of demeanor and other perceived sources of bias toward the government. None of these justifications, on its face, invokes the juror's race.[14]

Thus, moving to *Batson*'s third step, the question is whether, contrary to the district court's finding, Thompson has proven that the government's purported facially neutral reasons were pretexts for purposeful discrimination. At this step in the *Batson* analysis, "implausible or fantastic justifications may (and

[11] *See Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." (internal quotation marks and citation omitted)).

[12] *See Hernandez*, 500 U.S. at 359 ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."); *United States v. Broussard*, 987 F.2d 215, 220 n.4 (5th Cir. 1993).

[13] Technically, the government also justified striking Juror 37 by expressly stating that its decision was not motivated by considerations of race: "It had nothing to do with racism." Courts do not, however, give any weight to these types of disavowals of racial motivations. *See Batson*, 476 U.S. at 98 ("Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirm[ing] [his] good faith in making individual selections.'") (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)).

[14] This court has routinely found demeanor to be a race-neutral justification. *See, e.g.*, *United States v. Turner*, 674 F.3d 420, 436 (5th Cir. 2012) ("We have specifically approved of eye contact, or the lack thereof, as a valid neutral explanation."); *Moore v. Keller Indus., Inc.*, 948 F.2d 199, 202 (5th Cir. 1991) ("We also have found 'disinterested demeanor' and 'inattentiveness' to be valid, race-neutral reasons for peremptory strikes.").

probably will) be found to be pretexts for purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam). A prosecutor's intuitive assumptions, inarticulable factors, or even hunches can, however, be proper bases for rejecting a potential juror. *See Bentley-Smith*, 2 F.3d at 1374. At *Batson*'s third step, courts do not assess whether "counsel's reason is suspect, or weak, or irrational." *Id.* at 1375. Instead, courts address "whether counsel is telling the truth in his or her assertion that the challenge is not race-based." *Id.* In determining whether a prosecutor discriminated on the basis of race, a court should consider "the totality of the relevant facts." *Hernandez*, 500 U.S. at 363 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

Thompson only hints at three possible reasons the government's justifications could be pretext for purposeful racial discrimination. First, Thompson points to the relatively high percentage of black potential jurors struck by the prosecutor—here 71%. This fact by itself, while certainly relevant, does not establish purposeful discrimination.[15]

Second, Thompson argues that because the prosecutor treated similarly-situated jurors of a different race unequally, the prosecutor's race-neutral justification should be viewed as pretext for purposeful discrimination. The Supreme Court has recently endorsed such a side-by-side analysis.[16] Of the five black prospective jurors challenged, Thompson has, however, only sought comparison of Juror 4 with other non-black jurors in an effort to show purposeful discrimination. We accordingly limit our side-by-side comparison analysis to Juror 4.

---

[15] *See Miller-El v. Cockrell*, 537 U.S. 322, 331 (2003) ("91% of the eligible black jurors were removed by peremptory strikes. In contrast the prosecutors used their peremptory strikes against just 13% (4 out of 31) of the eligible nonblack prospective jurors qualified to serve on petitioner's jury. These numbers, while relevant, are not petitioner's whole case.").

[16] *See Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.").

As discussed above, the government relied on two race-neutral justifications in striking Juror 4. First, it struck her on the basis of demeanor, observing that "throughout the case, she sat there . . . look[ing] perturbed throughout the whole process." Second, the government justified striking Juror 4 because "her son was arrested for selling weed." In response, Thompson contends that the venire contained "multiple white jurors who indicated that family members had been subject to criminal convictions and/or arrests" and who were not similarly struck.

The district court considered Jurors 7, 40, and 44 as potential similarly situated non-black jurors whom the government failed to strike.[17] The government also urged the court to use Juror 16, also a black female with a family member convicted of a criminal offense (armed robbery), as the proper basis for comparison. The government justified its decision not to strike Juror 16, because, unlike Juror 4, Juror16 did not have a perturbed demeanor: "Based [on] . . . her demeanor [in] the courtroom, the government chose not to strike her . . . . . They are quite similar in their background. One sat there, looked pained and bothered. One did not."

In justifying its decision not to strike Jurors 7, 40, and 44, the government similarly noted that, as a general matter, those jurors did not share Juror 4's demeanor: "Those jurors did not sit there looking bothered and pained to be here." In fact, the government pointed out that it nevertheless would have struck Juror 7 if Thompson had not done so first. The government thought Juror 44 "never would have come into play," presumably because a jury would

---

[17] Thompson's brief does not specifically refer to any set of jurors as the appropriate comparison group, only vaguely referencing "[m]ultiple white jurors." During oral argument, defense counsel, for the first time, suggested that Juror 4 should be compared to Jurors 2, 7, 12, and 31. In light of the insufficient briefing on this issue, we consider defense counsel to have waived any argument that Juror 4 should be compared to Jurors 2, 12, and 31. *See United States v. Beaumont*, 972 F.2d 553, 563 (5th Cir. 1992).

have already been selected before reaching him. The government did not provide any additional specific justification for its decision not to strike Juror 40. The district court found the government's explanation to be "credible."

This side-by-side comparison does not reveal that the government purposefully discriminated in striking Juror 4. The government's comparison between Jurors 4 and 16 is persuasive. If its justification for striking Juror 4 was pretextual, one would expect it to have used the same justification to strike Juror 16, which it did not. The discussion of Jurors 7, 40, and 44 in the record similarly does not compel us to find purposeful discrimination.

Of course, in determining whether the government's justification was in fact pretextual, the district court had access to other relevant factors that cannot be judged from a cold record: The court witnessed the *voir dire* and was able to assess the prosecutor's credibility. Thompson has not and cannot point to anything in the record that shows that the court committed clear error.

Finally, Thompson argues that *Snyder v. Louisiana*, 552 U.S. 472 (2008), entitles him to succeed on his *Batson* challenge. Specifically, he urges that if a prosecutor, in response to a *Batson* challenge, justifies its use of a peremptory challenge solely on the juror's demeanor, *Snyder* requires the district court to state its assessment of demeanor on the record.

Before we address Thompson's claim, a discussion of *Snyder* is instructive. There, the prosecution struck all five of the prospective black jurors who remained on the thirty-six-member venire. In justifying his decision to strike Jeffrey Brooks, a black juror, the prosecutor offered two race-neutral explanations: (1) "[T]he main reason is that he looked very nervous to me throughout the questioning;" and (2) "[H]e's one of the fellows that came up at the beginning [of voir dire] and said he was going to miss class. He's a student teacher. My main concern is . . . that he might, to go home quickly, come back with guilty of a lesser verdict so there wouldn't be a penalty phase." *Id.* at 478. The trial court

found that Snyder had not established purposeful discrimination and denied his *Batson* challenge. *See State v. Snyder*, 750 So. 2d 832, 841 (La. 1999).

The Supreme Court reversed the conviction, finding that the trial court had committed clear error in rejecting Snyder's *Batson* objection. The Court began its discussion by reaffirming the principle it had announced in *Hernandez*: "[D]eference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike." *Snyder*, 552 U.S. at 479. Because "[t]he trial judge was given two explanations for the strike," and "the trial judge simply allowed the challenge without explanation," however, "the record [did] not show that the trial judge actually made a determination concerning [the juror's] demeanor." *Id.* In a case in which two race-neutral justifications have been advanced, "[i]t is possible that the judge did not have any impression one way or the other concerning [the juror's] demeanor." *Id.* Therefore, because of this ambiguity in the record, the Court could not presume that "the trial judge credited the prosecutor's assertion that [the juror] was nervous." *Id.*

The *Snyder* Court's holding, furthermore, depended on its conclusion that the prosecution's second reason for the strike was "suspicious," "implausib[le]," and "pretextual."[18] *Id.* at 482–83, 485. Consequently, the Court concluded that "in light of the circumstances here—including [the] absence of anything in the record showing that the trial judge credited the claim that [the juror] was nervous, the prosecution's description of both of its proffered explanations as 'main concern[s],' and the adverse inference [arising from the pretextual second justification]—the record does not show that the prosecution would have preemptively

---

[18] The Supreme Court found three persuasive reasons to believe the prosecutor's second justification was pretextual: (1) the brevity of the trial, (2) the juror's lessened concern upon his dean's assurances that any interruption would not cause a problem, and (3) the prosecutor did not challenge similarly-situated white jurors who had more onerous conflicts. *See id.* at 482–84.

challenged [the juror] based on his nervousness alone." *Id.* at 485 (citation omitted).

Thompson urges that *Snyder* should be extended to his facts: where the prosecutor has offered only a demeanor-based justification and the district court, though crediting the prosecutor's justification, has not made any specific findings of the juror's demeanor on the record. Thompson contends that these demeanor-based justifications are "subject to abuse" and are "not easily reviewed."

The circuits have disagreed on the extent to which *Snyder* imposes an affirmative duty on the district court to make record findings where the prosecutor has offered only a demeanor-based justification. The Seventh Circuit has read *Snyder* to impose an obligation on the court to make record findings, following a *Batson* challenge, where a prosecutor justifies the strike solely on the basis of the juror's demeanor. *See United States v. McMath*, 559 F.3d 657, 665-66 (7th Cir. 2009). In *McMath*, the district court "did not indicate whether it agreed that Juror 7 had an unhappy expression on his face, did not indicate whether this expression was unique to Juror 7 or common to other jurors, and *made no evaluation of the prosecutor's credibility*." *Id.* at 666 (emphasis added). The district court merely denied the *Batson* challenge. *Id.* In justifying its decision to remand for an evidentiary hearing, the Seventh Circuit noted that "*Synder* makes clear that a summary denial does not allow us to assume the prosecution's reason was credible; rather the district court's silence leaves a void in the record that does not allow us to affirm the denial." *Id.* *McMath* did not, however, specify what district-court findings would have been sufficient to have met its *Batson* obligations.[19]

The Eleventh Circuit, on the other hand, has not read *Snyder* to impose

---

[19] *McMath*, 559 F.3d at 666 ("We thus conclude that the district court clearly erred in denying the *Batson* challenge without making findings regarding the credibility of the proffered race-neutral justification for the strike.").

any obligation to make record findings in this situation. *See United States v. Prather*, 279 F. App'x 761, 767 (11th Cir. 2008) (per curiam). As that court explained, "The Supreme Court did not reverse Snyder's conviction because the district court had failed to explain itself clearly, but because it was unclear whether the district court's finding rested on a plausible or implausible explanation for the strike." *Id.*

We agree with the Eleventh Circuit that *Snyder* does not require a district court to make record findings of a juror's demeanor where the prosecutor justifies the strike based on demeanor alone. This requirement would severely undercut the Supreme Court's repeated observation that the third step of *Batson* depends on an assessment of the prosecutor's credibility. *See Hernandez*, 500 U.S. at 365.

Furthermore, the Supreme Court itself appears to read *Snyder* that way. In a habeas corpus case, a panel of this court addressed circumstances in which two different trial judges had presided over *voir dire* and the second judge, who credited the government's demeanor-based justification, had never personally viewed the prospective juror at issue. *See Haynes v. Quarterman*, 561 F.3d 535, 537 (5th Cir. 2009). The panel found that "clearly established" Supreme Court precedent required a trial court to conduct, on the record, a "'factual inquiry' or 'sensitive' inquiry into the demeanor-based reasons" for the strike. *Id.* at 541.

The Supreme Court reversed, *Thaler v. Haynes*, 559 U.S. 43 (2010), deciding that none of its "clearly established" precedent had created an obligation on a district court to make record findings of a juror's demeanor. *Id.* at 49. The Court found the panel's reliance on *Snyder* to be misplaced: "In holding that respondent is entitled to a new trial, the Court of Appeals cited two decisions of this Court, *Batson* and *Snyder*, but neither . . . held that a demeanor-based explanation for a peremptory challenge must be rejected unless the judge personally observed and recalls the relevant aspect of the prospective juror's

demeanor." *Id.* at 47.

It is true that *Haynes* establishes only that no Supreme Court decision "clearly established" the rule advanced by Thompson. Because AEDPA's[20] limitation of "clearly established" Supreme Court precedent does not apply to our review on direct appeal, we could adopt the *Haynes* panel's reasoning in the instant case. For the reasons discussed above, however, we respectfully take a different view of *Snyder*.

Furthermore, requiring district courts to make record findings of jurors' demeanor would not be workable. A district court, unlike the attorneys, may not always be a position to observe and record a potential juror's demeanor. Of course, if the district court has had the opportunity to observe and note a juror's demeanor, and the prosecutor justifies its strike based on demeanor, it would be better practice for the court to put its findings on the record. But *Snyder* does not require that.

In this case, the prosecutor justified striking two black jurors—Jurors 23 and 37—solely on the basis of their demeanor. For Juror 23, the district court found "the government's explanation credible." For Juror 37, the court made record findings on his demeanor: "I will say for the record that I did notice [Juror] 37 sort of looking up to the ceiling."

Unlike the records in *Snyder* and *McMath*, the record before us makes clear that, for both jurors, the district court found the prosecutor's demeanor-based justification credible. Furthermore, unlike the prosecutor in *Snyder*, the prosecutor here did not offer a second, suspect justification for either juror. *Snyder* requires no more. There is no reversible error in the district court's failure to make further record findings on Juror 23's demeanor.

---

[20] *See* the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

## III.

Challenging the sufficiency of the evidence to convict, Thompson appeals the denial of his motion for a judgment of acquittal. *See* FED. R. CRIM. P. 29(a). We review the denial *de novo*. *United States v. Greer*, 137 F.3d 247, 249 (5th Cir. 1998). We consider the evidence, all reasonable inferences drawn from it, and all credibility determinations in the light most favorable to the government, and we affirm if a reasonable jury could find the offense's essential elements proven beyond a reasonable doubt. *See United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997). Reviewing the sufficiency of the evidence is not about whether the outcome was correct but merely whether the verdict was reasonable. *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001).

The government presented three witnesses who testified to Thompson's role in the conspiracy. Albert Kelly stated that Thompson worked as a "runner," delivering crack and picking up money. Kelly also testified to the joint drug-related activities of the witnesses and Thompson. He stated that weapons were accessible to the conspiracy members at all of the locations where they met, including Thompson's house, and that Thompson was known as a "trigger man," someone who was known to have a gun during drug trafficking.

Gemayal Pipkins testified to Thompson's involvement in the conspiracy, explaining that Thompson was sometimes present during sales, carrying weapons as a "show of force" or participating in other drug-related activities. Pipkins also testified to having seen Thompson carrying one of the specific rifles that was introduced into evidence.

Lawrence Cavelier, a self-proclaimed drug runner for the conspiracy, testified that although he did not run drug errands for Thompson, he did personal errands for him and was paid with crack. Cavelier also talked about taking drug tools for cooking cocaine over to Thompson's house.

Thompson disputes that the evidence was sufficient under the conspiracy

charge. Specifically, he claims there was no evidence connecting him to the conspiracy other than the testimony of the co-conspirators.

A drug conspiracy requires evidence of "(1) the existence of an agreement between two or more persons to violate [the] narcotics laws; (2) the defendant's knowledge of the agreement; and (3) the defendant's voluntary participation in the agreement." *United States v. Gonzalez*, 76 F.3d 1339, 1346 (5th Cir. 1996). Contrary to Thompson's suggestion, "[a]s long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict." *United States v. Medina*, 161 F.3d 867, 872–73 (5th Cir. 1998) (internal quotation and citation omitted).

Kelly, Pipkins, and Cavelier testified to Thompson's role in the drug-trafficking scheme. Thompson does not point to any ways in which their testimony was "factually insubstantial or incredible." This evidence is sufficient: A rational trier of fact could find Thompson was a voluntary participant in a drug conspiracy.

Thompson disputes that the evidence was sufficient to convict him of possession of a weapon in furtherance of the drug-trafficking charge. To this end, he maintains that "no one puts a weapon in Mr. Thompson's hand or in immediate proximity to him."

Section 924(c)(1)(A) imposes a criminal penalty on "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A). Where, as here, a defendant is charged under the possession prong of this statute, "the appropriate standard of participation is 'in furtherance of' a crime." *United States v. McGilberry*, 480 F.3d 326, 329 (5th Cir. 2007).

Contrary to Thompson's assertion, testimony demonstrates that Thompson owned, carried, and used weapons in furtherance of the conspiracy. Per the testimony of DEA Agents Salvador Scalia and Jamey Tarrh, Thompson, shortly after being arrested, admitted to owning a loaded assault weapon found near the seized crack cocaine and money. Kelly and Pipkins also testified that Thompson carried a weapon during drug deals. In fact, Thompson was known as a "trigger man." Furthermore, Pipkins testified that Thompson used those weapons as part of a "show of force." Physical evidence further corroborated that testimony. The evidence is sufficient: A rational jury could find that Thompson possessed firearms in furtherance of a drug-trafficking crime. *See United States v. Ceballos-Torres*, 218 F.3d 409, 415 (5th Cir. 2000).

The judgment of conviction is AFFIRMED.

JAMES L. DENNIS, Circuit Judge, dissenting:

Defendant-appellant Eugene Thompson, an American of African descent, was convicted of crack and cocaine trafficking, conspiring to do the same, and several illegal firearms possession offenses. During the jury selection process that preceded his trial, the government used five of its seven peremptory strikes against black prospective jurors (numbers 4, 23, 25, 26, and 37), thus eliminating them from serving on Thompson's jury of twelve, which otherwise would have been about evenly divided between black and white jurors and instead, because of the government's strikes, consisted of two black jurors and ten white ones.[1] Thompson contended that the government was targeting African-Americans to strike on the basis of their race, thus violating the constitutional right to equal protection of the law. The district court disagreed, finding that the government's peremptory strikes were not made on the basis of race but rather for legitimate, nondiscriminatory reasons. At issue in this appeal is whether the district court properly applied the framework for ruling on such objections required by *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny. I agree with the majority that the district court did not clearly err with respect to prospective jurors 4, 25, 26 and 37. As for Thompson's objection to the government striking prospective juror 23, however, the record does not contain the requisite determinations for affirmance. Accordingly, I respectfully dissent.

## I.

During the jury selection process that preceded Thompson's criminal trial, the court instructed the jury to, one-by-one, stand up, state their name, their

---

[1] A "peremptory strike" (or "peremptory challenge") is "[o]ne of a party's limited number of challenges that do not need to be supported by a reason" (that is, in the absence of a showing that the strikes were made on a discriminatory basis), as contrasted with strikes for cause, which are strikes "supported by a specified reason, such as bias or prejudice, that would disqualify the potential juror." BLACK'S LAW DICTIONARY 261 (9th ed. 2009). *See also* Fed. R. Crim. P. 24 (specifying the number of peremptory strikes afforded to each side in federal criminal trials).

educational background, occupation, place of residence, and other aspects of their background. Prospective juror 23, who, like Thompson, was black, answered as follows:

> THE JUROR: . . . My level of education, some college. I worked as an offshore employee for 28 years. I live in the parish of Lafourche.
>
> THE COURT: Married?
>
> THE JUROR: Single. 15 years.
>
> THE COURT: You're a church organist; is that right?
>
> THE JUROR: That's correct.
>
> THE COURT: Thank you.

That appears to have been the only interaction between prospective juror 23 and the court or any attorney in the case before the government exercised a peremptory strike to remove him, to which Thompson objected under *Batson*.

## II.

## A.

Under *Batson*, if a criminal defendant intends to object to a peremptory strike as discriminatory, the defendant must first make a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005) (citing *Batson*, 476 U.S. at 93-94). This requirement of a prima facie case is intended to be "simple and without frills." *Price v. Cain*, 560 F.3d 284, 287 (5th Cir. 2009). It "is not meant to be onerous." *Sorto v. Herbert*, 497 F.3d 163, 170 (2d Cir. 2007); *accord Williams v. Beard*, 637 F.3d 195, 214 (3d Cir. 2011); *see also United States v. McMath*, 559 F.3d 657, 664 (7th Cir. 2009) ("The test is not rigorous: suspicion even less than 'more likely than not' suffices."); *United States v. Stavroulakis*, 952 F.2d 686, 696 (2d Cir. 1992) (stating that a "smoking gun" is not required). Defendants may present a prima facie case through a range of

evidentiary mosaics. *See Johnson*, 545 U.S. at 169.

Here, to support his prima facie case, Thompson showed that he was himself black and that the government had used five of its seven peremptory strikes against black prospective jurors. The district court did not decide that a prima facie case had been made, but rather reserved judgment and proceeded directly to *Batson*'s second step, requiring the government to offer a legitimate explanation for the strike. I agree with the majority that, because the government then offered such a legitimate explanation, the question of whether Thompson made an initial prima facie case is moot and has dropped out of the picture. *See Hernandez v. New York*, 500 U.S. 352, 359 (1991) ("Once the prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."); *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir. 1987) ("[A]ppellate review should not become bogged down on the question of whether the defendant made a *prima facie* showing in cases where the district court has required an explanation."). Accordingly, I proceed to the second step.

**B.**

The second step of *Batson* requires the government to "come forward with a neutral explanation for challenging" the prospective juror at issue. 476 U.S. at 97. "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation." *Hernandez*, 500 U.S. at 360. The explanation, so long as it is race neutral on its face, need not be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). "[N]early any race-neutral reason will suffice, even those that are arbitrary, irrational, or silly." *United States v. Rutledge*, 648 F.3d 555, 559 (7th

Cir. 2011).

Here, the transcript shows the following transpiring in the district court:

> THE COURT: . . . Let's go to Juror No. 23.
>
> [THE GOVERNMENT]: My notes reflect that he sat there, looking disinterested and annoyed. He was stern when he was awake. His arms were folded.

Although the government offered no explanation beyond a few words describing how the prospective juror looked, that explanation satisfied the government's burden on the second step. *See Moore v. Keller Indus., Inc.*, 948 F.2d 199, 202 (5th Cir. 1991) ("We also have found 'disinterested demeanor' and 'inattentiveness' to be valid, race-neutral reasons for peremptory strikes."). Accordingly, I proceed to the third step, where my concern lies.

## C.

On the third step, the district court "[has] the duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98. Although "nearly any race-neutral reason will suffice" at the second step, on the third step, "the persuasiveness of the justification becomes relevant, and implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Rutledge*, 648 F.3d at 559 (internal quotation marks omitted). To determine whether the peremptory strike was discriminatory, *Batson* "requires the judge to assess the plausibility of [the government's explanation for making the strike] in light of *all* evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005) (emphasis added); *see also Snyder v. Lousiana*, 552 U.S. 472, 478 (2008) (stating that "*all* of the circumstances that bear upon the issue of racial animosity must be consulted") (emphasis added); *Batson*, 476 U.S. at 93 (stating that the district court must "undertake a sensitive inquiry into such circumstantial and direct evidence of intent *as may be available*") (emphasis added). Because *Batson*

imposes on the district court the affirmative duty of determining whether there has been discrimination, at the third step, "[i]t is inappropriate for a district court to perfunctorily accept a race-neutral explanation without engaging in further investigation." *United States v. Jackson*, 347 F.3d 598, 605 (6th Cir. 2003); *see also Jordan v. Lefevre*, 206 F.3d 196, 200-01 (2d Cir. 2000) (holding that the trial court erred by "engag[ing] in a perfunctory exercise designed to speed the proceedings along" without "comply[ing] with the letter, much less the spirit, of *Batson*" and stating that the court disapproves of "a trial court conducting its review of a *Batson* challenge with undue haste and ruling in a summary fashion"); *cf. Thomas v. Moore*, 866 F.2d 803, 805 (5th Cir. 1989) (requiring *Batson* challenges to be made in a timely fashion because "the corresponding opportunity to evaluate the circumstances of the jury selection process [is] essential to [resolving the challenge]").[2] After weighing all the relevant circumstances, the court should then "issue a specific ruling on each juror in question supported by its findings of fact and its rationale for the ruling." *See United States v. Joe*, 928 F.2d 99, 103 (4th Cir. 1991).

---

[2] The *Batson* duty to determine whether a strike was discriminatory is not just a mere weighing of evidence, but an affirmative duty imposed on courts by the Constitution. The judiciary, like all other branches of government which operate under the authority of the Constitution's Equal Protection Clause, is duty-bound to eliminate race discrimination root and branch in its respective sphere, and if courts fail to rid the jury-selection process of race discrimination to the extent feasible, they have fallen short in their constitutional duty. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 626 (1991) (extending the *Batson* doctrine to civil trials between two private parties because, among other reasons, even though it is a private party, not a government attorney, making the discriminatory strike, "the objective of jury selection proceedings is to determine representation on a governmental body"); *id.* at 628 ("Race discrimination within the courtroom . . . mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality."); *Rutledge*, 648 F.3d at 562 ("[T]he Equal Protection Clause mandates that race discrimination be eliminated from all official acts and proceedings of the State, which is most compelling in the judicial system.") (internal quotation marks and alteration omitted); *Minetos v. City Univ. of N.Y.*, 925 F. Supp. 177, 183 (S.D.N.Y. 1996) (Motley, J.) ("[R]acial discrimination in the qualification or selection of jurors offends . . . the integrity of the courts.").

Once the district court has satisfied its duty of determining whether the strike was discriminatory, the district court's determination is a finding of fact that, like all findings of fact, is subject to highly deferential review on appeal. *United States v. Bentley-Smith*, 2 F.3d 1368, 1372 (5th Cir. 1993). We do not overturn such findings unless our study of the record leaves us "with the definite and firm conviction that a mistake has been committed." *Id.* at 1377. Although such review is greatly deferential, affirmance is not automatic. *See Riley v. Taylor*, 277 F.3d 261, 278 (3d Cir. 2001) (stating that, although *Batson*-related credibility findings receive great deference, "this does not signify that [appellate] review is a nullity") (quoting *Caldwell v. Maloney*, 159 F.3d 639, 651 (1st Cir. 1998)). This court must determine whether the district court's finding that the strike was not discriminatory was a rational one in light of all the evidence before the court. *See, e.g.*, *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400 (1990) ("[T]he 'clearly erroneous' standard [of appellate review of fact-finding] requires the appellate court to uphold any district court determination that falls within a broad range of permissible conclusions."); *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258-59 (5th Cir. 2006) ("If the district court's finding is plausible in light of the record viewed as a whole, the court of appeals cannot reverse . . . . The court owes even greater deference to findings based on the credibility of witnesses and must uphold them if based on coherent, internally consistent, and facially plausible testimony that is not contradicted by external evidence.") (footnotes omitted).

Here, the transcript shows that, immediately after the government offered its explanation for striking prospective juror 23, the district court carried out the *Batson* third-step proceedings as follows:

> [THE GOVERNMENT]: My notes reflect that he sat there, looking disinterested and annoyed. He was stern when he was awake. His arms were folded.

THE COURT: Any response?

[THE DEFENSE]: I did not observe these characteristics of No. 23. He did seem an honest, intelligent man, who has currently served as an organist at his church.

THE COURT: I find the government's explanation credible with respect to 23, and I deny the challenge with respect to the peremptory challenge as to 23. They've provided me with a race-neutral explanation for striking the juror. Let's go to Juror No. 25 [the next stricken prospective juror subject to a *Batson* challenge].

In my view, the above record statements contained in the transcript are insufficient for affirmance on appeal for the reasons that follow.

As the Supreme Court has explained, when the government justifies a peremptory strike on the basis of "a juror's demeanor (*e.g.*, nervousness, inattention)," assuming that the stricken juror is still in the courthouse, the trial court's duty to consider all relevant evidence means that the court "must evaluate *not only* whether the prosecutor's demeanor belies a discriminatory intent, *but also* whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder*, 552 U.S. at 477 (emphasis added).[3] Thus, in cases like this one, when the government's strike was justified on the basis of the prospective juror's purported "disinterested," "annoyed," and "stern" demeanor, and the venire had not yet been dismissed, meaning that the prospective juror was still in the control of the court, the district court must make at least two determinations: one, that the *prosecutor's* demeanor does not belie a discriminatory intent (that is, that the prosecutor appeared sincere in his explanation) *and*, two, that the

---

[3] It warrants brief mention that, in the ordinary case, the prospective juror subject to the peremptory strike will still be in the courthouse at the time the *Batson* challenge is raised because we require *Batson* challenges to be made before the venire is dismissed. *See United States v. Abou-Kassem*, 78 F.3d 161, 167 (5th Cir. 1996).

*stricken juror's* demeanor can credibly be said to have exhibited the characteristic that the prosecutor attributed to it. *See also McCurdy v. Montgomery Cnty.*, 240 F.3d 512, 521 (6th Cir. 2001) ("The need for an explicit, on-the-record analysis of each of the elements of a *Batson* challenge is especially important when the purported race-neutral justification is predicated on subjective explanations like body language or demeanor."); *United States v. Diaz*, 26 F.3d 1533, 1543 (11th Cir. 1994).[4] The question then is whether the district court actually made *both* determinations. Unless the record reveals both determinations, we cannot say on appeal whether the district court satisfied its duty of making a determination of race discrimination *vel non* on the basis of "*all* of the circumstances that bear upon the issue." *Snyder*, 552 U.S. at 478; *Miller-El*, 545 U.S. at 251-52; *Batson*, 476 U.S. at 93.

These determinations must be apparent on the face of the record and they may not be presumed. In *United States v. McNath*, the Seventh Circuit addressed circumstances in which the district court, after hearing the government explain that it struck a prospective juror because "[h]e looked angry and not happy to be here," stated without explanation that, "The *Batson* challenge is denied." 559 F.3d at 661. The Seventh Circuit declined to affirm, explaining, "The district court did not indicate whether it agreed that [the stricken juror] had an unhappy expression on his face, did not indicate whether this expression was unique to [him] or common to other jurors, and made no evaluation of the prosecutor's credibility." *Id*. at 666. Accordingly, because the district court did not make the requisite *Snyder* determinations on the

---

[4] *Cf. Palmer v. Lares*, 42 F.3d 975, 979-80 & n.6 (5th Cir. 1995) (affirming magistrate judge's findings on a *Batson* challenge when the attorney justified the strike on the basis of, among other things, the prospective juror's demeanor appearing to be "hostile" to the court and the magistrate judge's agreement that, based on the judge's own interaction with the prospective juror, the judge "felt the hostility that [the attorney] had pointed out"); *Durant v. Stack*, 151 F. Supp. 2d 226, 231-32 (E.D.N.Y. 2001).

record—that the prosecutor's demeanor did not belie a discriminatory intent and that the juror's demeanor could credibly be said to have exhibited the characteristic attributed to it — the circuit could not affirm. *Id.* ("*Snyder* makes clear that a summary denial does not allow us to assume that the prosecution's reason was credible; rather, the district court's silence leaves a void in the record that does not allow us to affirm the denial."). The circuit remanded to the district court, instructing it to either make the requisite factual determinations, or, "if the passage of time precludes the district court from [doing so], it must vacate the judgment of conviction." *Id.* In *United States v. Rutledge*, the Seventh Circuit reaffirmed this analysis. *See* 648 F.3d at 560. "[W]hen we confront an evidentiary gap at step three, the ultimate *Batson* issue cannot be resolved without a remand." *Id.*

Although this case differs from *McMath* and *Rutledge* in that, in those cases, the circuit was faced with summary denials of *Batson* challenges on a record devoid of any credibility determination by the trial judge, and we, on the other hand, have a record showing that the trial judge made the first but not the second credibility determination required by *Snyder*, we likewise "confront an evidentiary gap" that precludes affirmance. The prosecutor stated that he struck prospective juror 23 because, "My notes reflect that he sat there, looking disinterested and annoyed. He was stern when he was awake. His arms were folded." Thompson's counsel replied that he did not observe those characteristics and thought prospective juror 23 "seem[ed] an honest, intelligent man." The only rationale the district court offered for its decision to deny the *Batson* challenge was, "They've provided me with a race-neutral explanation for striking the juror" and "I find the government's explanation credible." But, as *Snyder* explains, when faced with a demeanor-based justification regarding a prospective juror that has not yet been dismissed by the court, the court "must evaluate *not only* whether the prosecutor's demeanor belies a discriminatory

25

intent, *but also* whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." 552 U.S. at 477 (emphasis added). The requisite second determination—that the juror's demeanor can credibly be said to have exhibited the basis asserted by the government—is absent from the record, and that is the gap we face. On the present record, we cannot say that the district court properly carried out its duty of making that determination on the record in choosing to deny the *Batson* challenge. Accordingly, I would remand for the district court to provide the missing determination or, if doing so proves impossible due to the passage of time, to vacate Thompson's conviction and grant him a new trial. *See McMath*, 559 F.3d at 666; *Rutledge*, 648 F.3d at 562; *see also In re TWL Corp.*, 712 F.3d 886, 898 (5th Cir. 2013) ("When, because of absence of findings of fact or conclusions of law, an appellate court cannot determine whether the record supports the lower court decision, it should remand the action for entry of findings of fact and conclusions of law.") (alteration and citation omitted); *Topalian v. Ehrman*, 3 F.3d 931, 935-36 (5th Cir. 1993) (remanding for "further factual findings" because the district court "failed to articulate its findings" and we require "an adequate record for appellate review").

It bears mentioning that none of this analysis is affected by *Thaler v. Haynes*, 559 U.S. 43 (2010) (per curiam), *rev'g* 526 F.3d 189 (5th Cir. 2008). There, the Court faced circumstances in which two different state judges presided at different stages of the case, and the judge who ruled on the *Batson* challenges did not preside during voir dire, meaning that the latter judge had not personally observed the voir dire or any of the prospective jurors that were stricken. The issue in *Haynes* was whether *Snyder* "clearly established" (as required by the habeas statute, *see* 28 U.S.C. § 2254(d)(1)) the rule that a state judge ruling on a *Batson* challenge must reject a demeanor-based explanation for the strike unless the judge personally observed and recalls the aspect of the

prospective juror's demeanor on which the explanation is based, which the state judge who decided the *Batson* challenges did not do. The answer to that question is no. *See also Rutledge*, 648 F.3d at 562 (discussing *Haynes*). *Haynes* said nothing about whether a district court faced with a demeanor-based explanation regarding a prospective juror who has *not yet been dismissed and is still in the courthouse, within the court's control*, must consider "whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder*, 552 U.S. at 477. The answer to that question is, for the reasons I have explained, yes. Moreover, in making its ruling, the district court must consider all relevant evidence, *id*. at 478 ("all of the circumstances that bear upon the issue of racial animosity"); *Miller-El*, 545 U.S. at 251-52 ("all evidence with a bearing on [the plausibility of the government's explanation]"); *Batson*, 476 U.S. at 93 ("such circumstantial and direct evidence of intent as may be available"), and when the government justifies the strike on the basis of the juror's demeanor, whether the juror's demeanor can credibly be said to have exhibited the characteristics alleged by the prosecutor *is* such relevant evidence. According to *Snyder*, whether the juror's demeanor can credibly be said to have exhibited the characteristics that the prosecutor alleged is a determination that the trial judge must make on the record. *See Rutledge*, 648 F.3d at 559 ("[I]f there is nothing in the record reflecting the trial court's decision, then there is nothing to which we can defer." (citing *Snyder*, 552 U.S. at 479)). *Haynes* did not alter the trial judge's duty to make the determinations for the record required by *Snyder*.

## III.

For the foregoing reasons, I respectfully dissent.